Jake KING, Appellant,

v.

Honorable Rogers C. B. MORTON,
Secretary of the Interior of the
United States.

No. 73–1995.

United States Court of Appeals,
District of Columbia Circuit.

Argued Jan. 10, 1975.

Decided Oct. 9, 1975.

As Amended Nov. 26, 1975.

Linda F. Blumenfeld, Washington, D. C., for appellant. Daniel A. Rezneck and Anthony Z. Roisman, Washington, D. C., were on the brief for appellant.

Edwin E. Huddleson, III, Atty., Dept. of Justice, with whom Carla A. Hills, Asst. Atty. Gen., Earl J. Silbert, U. S.

Atty., and Robert E. Kopp, Atty. Dept. of Justice, were on the brief for appellee.

Opinion for The Court filed by Circuit Judge ROBB.

Opinion filed by Circuit Judge TAMM, dissenting.

Before TAMM and ROBB, Circuit Judges, and HART,* Chief Judge, United States District Court for the District of Columbia.

ROBB, Circuit Judge:

In this action begun in the United States District Court for the District of Columbia the question presented to that court was whether, under the Constitution of the United States, an American citizen charged with a crime in violation of the laws of the unincorporated territory of American Samoa was entitled to a trial by jury. The District Court dismissed the action for lack of jurisdiction. We reverse and remand.

American Samoa is an unincorporated territory of the United States consisting of a cluster of small islands in the South Pacific. The Secretary of the Interior is responsible for administering the government of the territory. Exec. Order No. 10264, 3 C.F.R., 1949–1953 Comp. 765.

On January 3, 1972, Jake King, a citizen of the United States and a resident of American Samoa, was charged by information filed in the Trial Division of the High Court of American Samoa with

willful failure to pay his 1969 Samoan income tax and file his 1970 Samoan income tax return, in violation of section 18.0405 of the Revised Code of American Samoa (1961).[1] King moved for a jury trial, and on October 3, 1972, the Trial Division denied the motion for the following reasons:

1. The legislation and statutes of the Government of American Samoa do not provide for a jury trial, and

2. The Supreme Court of the United States has held that the constitutional right to a jury trial does not extend to territories which were not incorporated into the Union. *Balzac v. Porto Rico*, 258 U.S. 298, [42 S.Ct. 343, 66 L.Ed. 627] (1922).

King was tried in American Samoa on October 11 and 12, 1972. On December 11, 1972, the Trial Division issued its "Memorandum, Findings of Fact, Conclusions of Law, and Judgment", finding King guilty of willfully failing to pay his 1969 income tax and acquitting him of willfully failing to file his 1970 income tax return. *Government of American Samoa v. King*, Crim.Case No. 785 (High Ct.Am.Samoa, Trial Div., decided Dec. 11, 1972). On February 2, 1973, King was given a suspended sentence and placed on probation for twelve months, conditioned in part on his payment of all back taxes together with a fine of $250.00 and court costs of $25.00.

---

* Sitting by designation pursuant to 28 U.S.C. § 292(a).

1. Section 18.0405 has been recodified as 34 Am. Samoa Code § 214 (1973). American Samoa has adopted, with few changes, the United States Internal Revenue Code of 1954. 34 Am. Samoa Code §§ 201–214 (1973). Section 214 provides:

Any act or failure to act with respect to the American Samoa income tax which constitutes a criminal offense under chapter 75 of subtitle A of the United States Internal Revenue Code of 1954, as adopted by this chapter, shall be an offense against American Samoa and may be prosecuted in the name of American Samoa by the appropriate officer thereof.

Chapter 75 of subtitle A of the United States Internal Revenue Code of 1954 includes sec-

tion 7203, 26 U.S.C. § 7203 (1970), which provides:

Any person required under this title to pay any estimated tax or tax, or required by this title or by regulations made under authority thereof to make a return (other than a return required under authority of section 6015), keep any records, or supply any information, who willfully fails to pay such estimated tax or tax, make such return, keep such records, or supply such information, at the time or times required by law or regulations, shall, in addition to other penalties provided by law, be guilty of a misdemeanor and, upon conviction thereof, shall be fined not more than $10,000, or imprisoned not more than 1 year, or both, together with the costs of prosecution.

King appealed his conviction to the Appellate Division of the High Court of American Samoa. On April 1, 1974 the Appellate Division issued its opinion upholding King's conviction. Relying on the "*Insular cases*"[2] and *Balzac v. Porto Rico*, 258 U.S. 298, 42 S.Ct. 343, 66 L.Ed. 627 (1922), the court held that the right to jury trial guaranteed by the United States Constitution did not extend to persons tried in American Samoa and that the imposition of the Anglo-American jury system upon Samoa's legal structure "would be an arbitrary, illogical, and inappropriate foreign imposition". *Government of American Samoa v. King*, No. App. 63–73 (High Ct.Am.Samoa, App. Div., decided April 1, 1974). The decision of the Appellate Division of the High Court of American Samoa is final under Samoan law. 15 Am.Samoa Code § 5104 (1973).

On October 10, 1972, one week after the Trial Division had denied King's motion for a jury trial and the day before his trial began in American Samoa, King commenced this action in the United States District Court for the District of Columbia against the Secretary of the Interior as administrator of American Samoa "to declare unconstitutional the denial of the right of trial by jury to an American citizen charged with a crime in the court of American Samoa, a territory of the United States." Jurisdiction was grounded upon 28 U.S.C. §§ 1331, 1343 and 1361 (1970). King asked:

(A) That this Court declare and adjudge that the provisions of the Revised Code of American Samoa, the Rules of the High Court of American Samoa, and the rules and regulations of the Secretary of the Interior, which deny the right of trial by jury in criminal cases in American Samoa are unconstitutional on their face and as applied to plaintiff, and that the defendant, his appointees, agents, employees, and all other persons subject to his authority and control cannot lawfully enforce these provisions or act pursuant to them;

(B) That this Court permanently enjoin the defendant, his appointees, agents, employees, and all other persons subject to his authority and control from enforcing any judgment of criminal conviction against plaintiff obtained without according him a right to trial by jury; and

(C) That this Court award plaintiff such other and further relief as may be just and equitable under the circumstances.

In May 1973, before King's conviction had become final in American Samoa, both King and the Secretary of the Interior moved for summary judgment. The District Court heard argument on the motions and afterward by order dismissed the case for lack of jurisdiction. King appeals.

I. Jurisdiction of the District Court

A. Geographical Jurisdiction

Since the District Court proffered no explanation for dismissing King's case for want of jurisdiction, we must look to the government's argument in this court to find the reasons for the decision. The government's argument is that American Samoa is outside the geographical bounds of the jurisdiction of the United States District Courts,[3] and that conse-

---

**2.** The Appellate Division cited as "*Insular Cases*" *De Lima v. Bidwell*, 182 U.S. 1, 21 S.Ct. 743, 45 L.Ed. 1041 (1901); *Goetze v. United States*, 182 U.S. 221, 21 S.Ct. 742, 45 L.Ed. 1065 (1901); *Dooley v. United States*, 182 U.S. 222, 21 S.Ct. 762, 45 L.Ed. 1074 (1901); *Armstrong v. United States*, 182 U.S. 243, 21 S.Ct. 827, 45 L.Ed. 1086 (1901); *Downes v. Bidwell*, 182 U.S. 244, 21 S.Ct. 770, 45 L.Ed. 1088 (1901); and *Huus v. New York and Porto Rico Steamship Company*, 182 U.S. 392, 21 S.Ct. 827, 45 L.Ed. 1146 (1901). These

cases, properly referred to collectively as the *Insular Tariff Cases*, also include, in addition to the foregoing, *Dooley v. United States*, 183 U.S. 151, 22 S.Ct. 62, 46 L.Ed. 128 (1901), and *Fourteen Diamond Rings v. United States*, 183 U.S. 176, 22 S.Ct. 59, 46 L.Ed. 138 (1901).

**3.** The government does not argue that cases arising under the Constitution, laws and treaties of the United States in American Samoa are totally outside the judicial power of the United States under Article III of the Constitu-

quently those courts cannot "rule on matters affecting and altering the customs and traditions of the Samoan people." The government contends that the Samoan courts are competent to adjudicate claims of Samoan litigants arising under the laws of the United States so that jurisdiction of the district courts over such claims is unnecessary. Moreover we are warned that if the doors of the district courts are opened to such claims the federal courts will soon be inundated with cases concerning matters halfway around the world without the knowledge to handle such matters or the power to order relief.

■ Whatever force the government's argument might have in cases against the Samoan government or its officers involving the interpretation or application of Samoan law,[4] the argument has no application to this case. Here the sole defendant is the Secretary of the Interior, and the issue is whether he has administered the government of American Samoa in accordance with the requirements of the United States Constitution. Clearly, the Secretary is within the geographical jurisdiction of the United States District Court for the District of Columbia, and that court is competent to judge the Secretary's administration of the government of American Samoa by constitutional standards and, if necessary, to order the Secretary to take appropriate measures to correct any constitutional deficiencies. Although it may be necessary for the District Court to inquire into matters of Samoan law and custom in order to determine the applicability of principles embodied in the laws and Constitution of the United States, this case focuses on the applicability of those principles and not on Samoan laws and customs themselves.

■ Furthermore, that Samoan courts are competent to adjudicate claims of Samoan litigants arising under the laws of the United States does not prevent district courts from hearing such claims when jurisdiction is otherwise proper. The availability of remedies in the Samoan courts may give rise to a requirement that such remedies be exhausted before proceeding in the district courts, but that availability cannot act as a complete bar to district court proceedings. Exhaustion is not at issue here, since King has already appealed his conviction to the highest court in American Samoa. What is at issue is whether King can ever bring this action in the district court when alternative remedies were available to him in the Samoan courts. We hold he can, provided there is some statutory basis for jurisdiction. This does not mean that the door of the district court is open wide to claims properly within the peculiar province of the Samoan courts, but only that it cannot be shut to Samoan plaintiffs properly challenging the lawfulness of the actions of an official of the United States government.

Assuming that the District Court relied exclusively upon the government's geographical jurisdiction argument in dismissing this case for want of jurisdiction, we think the court erred. We do not hold, however, that jurisdiction was proper, for, as we explain below, we cannot tell from the record whether there is a sufficient statutory basis for jurisdiction in this case. Accordingly, we must remand the case for further proceedings, but before we do, we examine briefly each of the jurisdictional bases claimed by King.

## B. Statutory Bases for Jurisdiction

■ King first claims jurisdiction under 28 U.S.C. § 1331(a) (1970), which provides:

tion; it argues only that United States District Courts are courts of limited jurisdiction, and that Congress has not extended those limits to include American Samoa. This case does not present the question whether the Supreme Court has appellate jurisdiction over decisions rendered by the Samoan courts, a question on which we intimate no view.

4. *See General Constructors Co. of Nevada v. Morton*, Civ. No. 71–3409 (D.Hawaii, decided Sept. 16, 1971), which involved the award of a construction contract by the government of American Samoa on the basis of competitive bids received.

The district courts shall have original jurisdiction of all civil actions wherein the matter in controversy exceeds the sum or value of $10,000, exclusive of interest and costs, and arises under the Constitution, laws, or treaties of the United States.

Although King's action is a civil action arising under the Constitution and laws of the United States, we cannot determine on the basis of the record before us whether the action involves a "matter in controversy [which] exceeds the sum or value of $10,000, exclusive of interest and costs." This amount-in-controversy requirement is a prerequisite for jurisdiction under section 1331(a), even in cases in which fundamental constitutional rights are at stake, however difficult the valuation of such rights may be. *Lynch v. Household Finance Corp.*, 405 U.S. 538, 547, 92 S.Ct. 1113, 31 L.Ed.2d 424 (1972). As we have said in *Gomez v. Wilson*, 155 U.S.App.D.C. 242, 252 n. 56, 477 F.2d 411, 421 n. 56 (1973):

> So notwithstanding a deep-seated feeling that price-tagging of fundamental human rights is dangerous business, we realize that any automatic finding of the required amount in controversy just because such rights are in issue may be a more simplistic solution than § 1331(a) will tolerate.

The burden of establishing the amount in controversy is on the person claiming jurisdiction, and the district court may question at any time whether the jurisdictional amount has been shown. *McNutt v. General Motors Acceptance Corp.*, 298 U.S. 178, 189, 56 S.Ct. 780, 80 L.Ed. 1135 (1936). *See* 13 C. Wright, A. Miller & E. Cooper, Federal Practice and Procedure § 3561 (1975).

 King alleged in his complaint that "[t]he amount in controversy in this case exceeds $10,000, exclusive of interest and costs." When King filed his complaint he had not yet been tried in American Samoa and faced a possible maximum penalty greatly in excess of $10,000. Normally, jurisdictional amount is determined as of the filing of the complaint. However, before the District Court could take any action the Trial Division of the High Court of American Samoa convicted King and sentenced him to pay $1,098.26 in back taxes plus interest, a fine of $250.00 and court costs of $25.00. Thus, when the cross-motions for summary judgment were filed and argued in the District Court the total amount of King's actual liability under this conviction was much less than $10,000, and might have been even less had the conviction been overturned on appeal. If the determination of amount in controversy were so simple we might well hold that King failed to prove the necessary jurisdictional amount, even though his potential liability at the time his complaint was filed exceeded $10,000, since his actual liability at the time the case came before the District Court did not. But the "amount in controversy" here, which must exceed $10,000, is not the cost to King of his conviction but the value of his right to a trial by jury. The value of that right is certainly no less than the liability incurred by King as a result of his conviction, but we cannot say on the basis of this record whether it is more, or if it is, how much. This determination is for the District Court.

 King next claims jurisdiction under 28 U.S.C. § 1343 (1970), which provides:

> The district courts shall have original jurisdiction of any civil action authorized by law to be commenced by any person:
>
> (1) To recover damages for injury to his person or property, or because of the deprivation of any right or privilege of a citizen of the United States, by any act done in furtherance of any conspiracy mentioned in section 1985 of Title 42;
>
> (2) To recover damages from any person who fails to prevent or to aid in preventing any wrongs mentioned in section 1985 of Title 42 which he had knowledge were about to occur and power to prevent;

(3) To redress the deprivation, under color of any State law, statute, ordinance, regulation, custom or usage, of any right, privilege or immunity secured by the Constitution of the United States or by any Act of Congress providing for equal rights of citizens or of all persons within the jurisdiction of the United States;

(4) To recover damages or to secure equitable or other relief under any Act of Congress providing for the protection of civil rights, including the right to vote.

Subsections 1343(1) and (2), which give the district court jurisdiction over civil actions "[t]o recover damages", cannot provide the basis for King's action for declaratory judgment and injunctive relief. Nor can subsection 1343(3), which applies to actions to redress the deprivation of fundamental rights under color of State law, support King's claim that under the laws of American Samoa and regulations of the Secretary of the Interior he has been deprived of his constitutional right to trial by jury. This leaves subsection 1343(4), which gives the district court jurisdiction over actions brought "under any Act of Congress providing for the protection of civil rights". King cites no such Act, applicable to the Secretary of the Interior, and we can find none, so that jurisdiction cannot be founded on subsection 1343(4). Accordingly, we hold that 28 U.S.C. § 1343 (1970) does not provide a jurisdictional basis for King's action.

King also claims jurisdiction under 28 U.S.C. § 1361 (1970), which provides:

The district courts shall have original jurisdiction of any action in the nature of mandamus to compel an officer or employee of the United States or any agency thereof to perform a duty owed to the plaintiff.

Not only is a duty owed to the plaintiff necessary to give the district court jurisdiction under section 1361, but as this court has said, "The writ should be used only when the duty of the officer to act is clearly established

and plainly defined and the obligation to act is peremptory." *Hammond v. Hull,* 76 U.S.App.D.C. 301, 303, 131 F.2d 23, 25 (1942), *cert. denied,* 318 U.S. 777, 63 S.Ct. 830, 87 L.Ed. 1145 (1943) [footnote omitted]. Thus, the writ is not available to King unless the Secretary of the Interior has a "clearly established", "plainly defined" and "peremptory" duty, in administering the government of America Samoa, to require that government to provide for trial by jury as guaranteed by the United States Constitution. Whether the Secretary has such a duty is a jurisdictional question, which cannot be answered without inquiry into the merits of King's claim. That inquiry should be made in the first instance by the District Court. Accordingly remand for further proceedings is appropriate.

## II. The Right to Trial by Jury in American Samoa

Because of the importance of King's constitutional claim we have decided that the jurisdictional problems discussed above must be resolved before that claim is finally adjudicated. In addition to those problems there is another obstacle which prevents us from reaching the merits of King's claim, and we think it proper to add a few words to assist the District Court on remand in the event that court finds it has jurisdiction. We emphasize, however, that in so doing we intimate no opinion as to the proper adjudication of the jurisdictional issues we have raised.

King's argument that he is entitled to a jury trial in American Samoa is a tidy syllogism. He admits that only "fundamental" constitutional rights apply to unincorporated territories such as American Samoa. *Insular Tariff Cases, supra* note 2; *Hawaii v. Mankichi,* 190 U.S. 197, 23 S.Ct. 787, 47 L.Ed. 1016 (1903); *Dorr v. United States,* 195 U.S. 138, 24 S.Ct. 808, 49 L.Ed. 128 (1904); *Balzac v. Porto Rico,* 258 U.S. 298, 42 S.Ct. 343, 66 L.Ed. 627 (1922). He also concedes that the Supreme Court has held that the right to trial by jury is not "fundamental". *Hawaii v. Mankichi, Dorr v. Unit-*

ed States, *Balzac v. Porto Rico, supra.* But, he says, the Supreme Court has reversed its position in those cases and held the right to trial by jury to be "fundamental". *Duncan v. Louisiana,* 391 U.S. 145, 88 S.Ct. 1444, 20 L.Ed.2d 491 (1968); *Baldwin v. New York,* 399 U.S. 66, 90 S.Ct. 1886, 26 L.Ed.2d 437 (1970). So, he concludes, the right to trial by jury applies to American Samoa.

The feature of King's argument that gives us pause is not its logic but its generality. Chief Justice Marshall warned against basing decisions on bare general principles enunciated in other cases:

> It is a maxim, not to be disregarded, that general expressions, in every opinion, are to be taken in connection with the case in which those expressions are used. If they go beyond the case, they may be respected, but ought not to control the judgment in a subsequent suit, when the very point is presented for decision. The reason of this maxim is obvious. The question actually before the court is investigated with care, and considered in its full extent. Other principles which may serve to illustrate it, are considered in their relation to the case decided, but their possible bearing on all other cases is seldom completely investigated.

*Cohens v. Virginia,* 19 U.S. (6 Wheat.) 264, 399–400, 5 L.Ed. 257 (1821). The simple words of the opinions King cites are not as important as the contexts in which those cases were decided. The *Balzac, Dorr, Hawaii* and the *Insular Tariff* cases all involved unincorporated territories similar to American Samoa, but at a time much earlier in our nation's history. Those cases have never been overruled; specifically, they have not been overruled by the *Duncan* and *Baldwin* cases, which dealt with the right to trial by jury in states rather than unincorporated territories. The decision in the present case does not depend on key words such as "fundamental" or "unincorporated territory" in those opinions, but can be reached only by applying the principles of the earlier cases, as controlled by their respective contexts, to the situation as it exists in American Samoa today. As Mr. Justice Harlan wrote in *Reid v. Covert,* 354 U.S. 1, 75, 77 S.Ct. 1222, 1260, 1 L.Ed.2d 1148 (1957) (Harlan, J., concurring in result), "the particular local setting, the practical necessities, and the possible alternatives are relevant to a question of judgment, namely, whether jury trial *should* be deemed a necessary condition of the exercise of Congress' power to provide for the trial of Americans overseas."

■ The importance of the constitutional right at stake makes it essential that a decision in this case rest on a solid understanding of the present legal and cultural development of American Samoa. That understanding cannot be based on unsubstantiated opinion; it must be based on facts. Specifically, it must be determined whether the Samoan mores and *matai* culture with its strict societal distinctions will accommodate a jury system in which a defendant is tried before his peers; whether a jury in Samoa could fairly determine the facts of a case in accordance with the instructions of the court without being unduly influenced by customs and traditions of which the criminal law takes no notice; and whether the implementation of a jury system would be practicable. In short, the question is whether in American Samoa "circumstances are such that trial by jury would be impractical and anomalous." *Reid v. Covert,* 354 U.S. at 75, 77 S.Ct. at 1260. That the Samoan system of criminal justice is in many respects similar to the Anglo-American system does not supply the answer to this specific and crucial question. Nor is the answer to be found in the failure of the Samoan Constitution, originated by the Samoan people, to provide for trial by jury in criminal cases.

In support of his motion for summary judgment in the District Court King relied upon various provisions of the Samoan Constitution and Code which assimilate features of American criminal procedures. Reliance was also placed on

an affidavit on information and belief from King's Samoan counsel, to the effect that so far as logistics are concerned jury trials in Samoa are feasible. Finally, King cited a law review article by a former intern in the Office of the Attorney General of American Samoa in 1970 (Some Observations on the Judiciary in American Samoa, 18 U.C.L.A.L.Rev. 581 (1971)). The government countered with provisions of the Samoan Constitution and Code, a 1970 report on the future political status of Samoa submitted to the Samoan legislature in 1971, and a letter from the Chief Judge of Samoa to the Solicitor of the Department of the Interior, dated October 10, 1961. Having examined these materials we find them inadequate to supply an answer to the important question presented here, and therefore insufficient to support a judgment for either party. On the basis of an affidavit on information and belief, an *ex parte* letter fourteen years old, a law journal article and a legislative report which appears to be largely irrelevant no one can say with certainty whether trial by jury in Samoa would be impractical and anomalous. The answer to that question must come from more solid evidence of actual and existing conditions. For this reason, since we have determined that there is probable jurisdiction in the District Court we reverse its judgment and remand the case for further proceedings in which an adequate factual record may be developed. When the facts have been found and elucidated the District Court will be in a position to determine whether summary judgment for either party is appropriate.

*So ordered.*

TAMM, Circuit Judge (dissenting):

This case raises the question whether the guarantees of jury trial as embodied in our Constitution are applicable to the territory of American Samoa. After assuring that jurisdiction is proper, I answer that question affirmatively.

## I. Background

On January 3, 1972, appellant Jake King, an American citizen, was charged by information in the Trial Division of the High Court of American Samoa with willful failure to pay Samoan income tax and to file an income tax return with the Tax Office of Samoa in violation of section 7203 of the United States Internal Revenue Code of 1954, as adopted by section 18.0405 of the Revised Code of American Samoa.[1] The maximum penalty on each charge is a fine of $10,000 or imprisonment for one year, or both. On October 3, 1972, the Chief Justice of American Samoa denied Mr. King's motion for a jury trial, stating:

1. The legislation and statutes of the Government of American Samoa do not provide for a jury trial, and

2. The Supreme Court of the United States has held that the constitutional right to a jury trial does not extend to territories which were not incorporated into the Union. *Balzac v. Porto Rico,* 258 U.S. 298, 42 S.Ct. 343, 66 L.Ed. 627 (1922).[2]

1. App. Item 10. The Government of American Samoa has adopted, with relatively minor alteration, the United States Internal Revenue Code of 1954. Section 18.0405 of the Revised Code of American Samoa, enacted in 1963, Am.Samoa Pub.L. No. 8–1, now codified at 34 Am.Samoa Code § 214 (1973), makes "a criminal offense under chapter 75 of subtitle F[A] of the United States Internal Revenue Code of 1954 . . . an offense against American Samoa . . . ." *Id.* 26 U.S.C. § 7203 provides:

 § 7203. Willful failure to file return, supply information, or pay tax.

 Any person required under this title to pay any estimated tax or tax, or required by this title or by regulations made under authority

thereof to make a return (other than a return required under authority of section 6015), keep any records, or supply any information, who willfully fails to pay such estimated tax or tax, make such return, keep such records, or supply such information, at the time or times required by law or regulations, shall, in addition to other penalties provided by law, be guilty of a misdemeanor and, upon conviction thereof, shall be fined not more than $10,000, or imprisoned not more than 1 year, or both, together with the costs of prosecution.

2. App. Item 13. Interestingly, the Chief Justice of American Samoa is statutorily empowered to, and does, sit as a trial judge in the Trial Division of the High Court. 5 Am.Samoa Code § 408(c).

One week later, Mr. King commenced this action in the District Court for the District of Columbia, seeking declaratory and injunctive relief. *King v. Morton,* Civil No. 2030–72, Complaint (D.D.C., filed Oct. 10, 1972). Jurisdiction was premised upon 28 U.S.C. §§ 1331, 1343, and 1361 (1970), *id.* at 2, and the relief prayed for was clear and concise:

(A) That this Court declare and adjudge that the provisions of the Revised Code of American Samoa, the Rules of the High Court of American Samoa, and the rules and regulations of the Secretary of the Interior, which deny the right of trial by jury in criminal cases in American Samoa are unconstitutional on their face and as applied to plaintiff, and that the defendant, his appointees, agents, employees, and all other persons subject to his authority and control cannot lawfully enforce these provisions or act pursuant to them;

(B) That this Court permanently enjoin the defendant, his appointees, agents, employees, and all other persons subject to his authority and control from enforcing any judgment of criminal conviction against plaintiff obtained without according him a right to trial by jury . . . .

*Id.* at 67. On cross-motions for summary judgment, the trial judge, on June 8, 1973, dismissed the case for lack of jurisdiction, and this appeal followed.

During the pendency of the district court action, Mr. King was tried by a judge in American Samoa. He was acquitted of willful failure to file a tax return, but found guilty of willful failure to pay his 1969 income tax. App. Item 14 at 17. On February 2, 1973, the court suspended imposition of the sentence, placed Mr. King on probation for twelve months, and fined him $250 plus $25 court costs. App. Item 15 at 1–2. Thereafter, he appealed to the Appellate Division of the High Court, asserting, *inter alia,* that the trial court erred in denying his motion for a jury trial. Holding that there is no constitutional

right to a jury trial in American Samoa, the Appellate Division affirmed the judgment of the Trial Division. *Government of American Samoa v. King,* No. 63–73 at 8–13 (High Ct.Am.Samoa, App. Div., filed April 1, 1974), App.Gov't Br. at 10a–15a.

In this court, the parties raise two issues. First, whether the District Court for the District of Columbia possesses jurisdiction to entertain the instant action—I think that it does. Second, since jurisdiction is proper, the parties are not in disagreement as to any material issue of fact, and all that remains is a pure question of law, I perceive no reason to delay further a decision on the merits by remanding this case to the district court; and thus, in the interest of justice, I would reach and resolve the ultimate issue of whether the United States Constitution requires that, in prosecutions for serious criminal offenses in American Samoa, the accused be afforded the right to a trial by jury—I think that it does.

## II. Jurisdiction

Without any further elaboration, the district judge simply dismissed this case for "lack of jurisdiction." The district court may have felt compelled to defer to the Samoan proceedings based upon the principles of equity, comity and federalism expressed by the Supreme Court in *Younger v. Harris,* 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971) though it was not jurisdictionally barred from hearing the case. However, regardless of the applicability of *Younger* to territorial court proceedings, *Martinez v. Commonwealth of Puerto Rico,* 343 F.Supp. 897, 902–04 (D.P.R.1972); *see Stainback v. Mo Hock Ke Lok Po,* 336 U.S. 368, 383–84, 69 S.Ct. 606, 93 L.Ed. 741 (1949); *Ackerman v. Int'l Longshoremen's and Warehousemen's Union,* 187 F.2d 860, 868–69 (9th Cir.), *cert. denied,* 342 U.S. 859, 72 S.Ct. 85, 96 L.Ed. 646 (1951); *Rodriguez Rivera v. Maiz,* 331 F.Supp. 713, 715–17 (D.P.R.1971), the prosecution of Mr. King in American Sa-

moa has now run its full course,[3] and federal judicial restraint, as the Government concedes, is no longer necessary on this basis. In absence of this bar, I am nevertheless obligated to inquire as to a proper basis for jurisdiction before reaching the merits.

In district court, appellant alleged jurisdiction pursuant to 28 U.S.C. §§ 1331 (federal question), 1343 (civil rights), and 1361 (mandamus). At first blush, section 1331[4] is appealing; however, on this record, the $10,000 jurisdictional amount requirement raises a significant barrier, since the value of appellant's federal claim must exceed that amount. *See Gomez v. Wilson,* 155 U.S.App.D.C. 242, 477 F.2d 411, 419–20 and n.56 (1973). The problem is not diminished by the mere fact that Mr. King faced a potential penalty of $20,000 in the Samoan prosecution at the time this action was initiated in the district court because, even if he were tried by a jury, his potential liability would remain constant. It is, nonetheless, conceivable that he could have made a showing in district court sufficient to sustain the requisite jurisdictional amount. *Tatum v. Laird,* 144 U.S.App.D.C. 72, 444 F.2d 947, 951 and n.6 (1971), *rev'd on other grounds,* 408 U.S. 1, 92 S.Ct. 231, 33 L.Ed.2d 154 (1972). *See generally* 1 *Moore's Federal Practice* ¶¶ 0.91, 0.95–0.96. In this re-

gard, the record before us is incomplete and thus, jurisdiction cannot rest on 1331.

While my concern with 1331 could have been allayed in the district court, the problems raised concerning 28 U.S.C. § 1343,[5] the jurisdictional complement to various civil rights statutes, are insurmountable. Quite plainly, the case *sub judice* is a suit against a *federal* official for equitable relief *only*; the Secretary of the Interior is the sole defendant, and appellant does not seek damages. As such, paragraphs 1 and 2 of section 1343, which by their plain terms concern actions "[t]o recover damages," are inapplicable here. Likewise, 1343(3) fails to sustain jurisdiction since it "applies only to alleged infringements of rights under 'color of . . . State law' . . . [and t]hus, . . . in suits against federal officials for alleged deprivations of constitutional rights, it is necessary to satisfy the amount-in-controversy requirement for federal jurisdiction." *Lynch v. Household Finance Corp.,* 405 U.S. 538, 547, 92 S.Ct. 1113, 1119, 31 L.Ed.2d 424 (1972) (citations omitted). What remains is paragraph 4, which was added to section 1343 by the Civil Rights Act of 1957. 71 Stat. 634, 637 (1971). Although 1343(4) does not contain the "color of any State law" phraseology of 1343(3), neither its brief legislative histo-

---

**3.** While Congress has provided for Supreme Court review of final judgments rendered by the Supreme Court of Puerto Rico, 28 U.S.C. § 1258 (1970), and of some judgments rendered by the Federal District Courts of the Canal Zone, Guam, and the Virgin Islands, 28 U.S.C. § 1252 (1970), there is no such provision regarding the High Court of American Samoa.

**4.** 28 U.S.C. § 1331(a) (1970) provides:

(a) The district courts shall have original jurisdiction of all civil actions wherein the matter in controversy exceeds the sum or value of $10,000, exclusive of interest and costs, and arises under the Constitution, laws, or treaties of the United States.

**5.** 28 U.S.C. § 1343 (1970) provides:

The district courts shall have original jurisdiction of any civil action authorized by law to be commenced by any person:

(1) To recover damages for injury to his person or property, or because of the depri-

vation of any right or privilege of a citizen of the United States, by any act done in furtherance of any conspiracy mentioned in section 1985 of Title 42;

(2) To recover damages from any person who fails to prevent or to aid in preventing any wrongs mentioned in section 1985 of Title 42 which he had knowledge were about to occur and power to prevent;

(3) To redress the deprivation, under color of any State law, statute, ordinance, regulation, custom or usage, of any right, privilege or immunity secured by the Constitution of the United States or by any Act of Congress providing for equal rights of citizens or of all persons within the jurisdiction of the United States;

(4) To recover damages or to secure equitable or other relief under any Act of Congress providing for the protection of civil rights, including the right to vote.

ry, *H.R.Rep.No.*291, 85th Cong., 1st Sess. 11 (1957), U.S.Code Cong. & Admin. News, 1957, p. 1966, nor its subsequent judicial interpretation, *e. g., Bivens v. Six Unknown Federal Narcotics Agents*, 403 U.S. 388, 398 n.1, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971) (Harlan, J., concurring in the judgment), *citing* 409 F.2d 718, 720 n.1 (2d Cir. 1969); *Ramirez v. Weinberger*, 363 F.Supp. 105, 108 (N.D. Ill.1973) (three-judge court), *aff'd without opinion*, 415 U.S. 970, 94 S.Ct. 1553, 39 L.Ed.2d 867 (1974), indicates that it was intended to encompass actions of federal officials. While 1343(4) has been successfully asserted as a basis for jurisdiction over actions of state officials, *see, e. g., Wilwording v. Swenson*, 404 U.S. 249, 251, 92 S.Ct. 407, 30 L.Ed.2d 418 (1971); *Allen v. State Bd. of Elections*, 393 U.S. 544, 554–57, 89 S.Ct. 817, 22 L.Ed.2d 1 (1969), appellant has not cited, and I have not uncovered, so much as a single case, holding 1343(4) to be a proper jurisdictional basis over actions of federal officials. Moreover, even assuming the existence of such authority, appellant has not proffered "any Act of Congress providing for the protection of civil rights," directed to federal officials, upon which 1343(4) jurisdiction could be asserted. *See Moor v. County of Alameda*, 411 U.S. 693, 702–03, 93 S.Ct. 1785, 36 L.Ed.2d 596 (1973), wherein a similar deficiency befell plaintiffs relying upon 42 U.S.C. § 1988 (1970). Thus, on the record herein, and in light of the considerations discussed above, I would be hard-pressed to find jurisdiction under either 28 U.S.C. § 1331 or § 1343. However, there remains an alternative basis of jurisdiction which appellant alleged, and which I think properly vests jurisdiction—28 U.S.C. § 1361.[6]

Section 1361 provides that "[t]he district courts shall have original jurisdiction of any action in the nature of mandamus to compel an officer or employee of the United States or any agency thereof to perform a duty owed to the plaintiff." Unquestionably, the purpose of this section was to provide jurisdiction in all federal district courts over actions which previously could have been brought only in the District Court for the District of Columbia. *S.Rep.No.*1992, 87th Cong., 2d Sess. 2 (1962), U.S.Code Cong. & Admin.News, 1962, p. 2784. *See also Note on the Jurisdictional Amount Requirement in Suits Challenging the Validity of Federal Government Action*, P. Bator, P. Mishkin, D. Shapiro & H. Wechsler, Hart and Wechsler's The Federal Courts and the Federal System 1160–61 (2d ed. 1973); 4 C. Wright and A. Miller, Federal Practice and Procedure § 1107, at 421 and n.68 (1969); Jacoby, *The Effect of Recent Changes in the Law of "Nonstatutory" Judicial Review*, 53 Geo.L.J. 19 (1964). Courts have subsequently held 1361 to be an independent grant of federal jurisdiction regardless of the amount in controversy. *See, e. g., National Treasury Employees Union v. Nixon*, 160 U.S.App.D.C. 321, 492 F.2d 587, 592 (1974); *Peoples v. United States Dep't of Agriculture*, 138 U.S. App.D.C. 291, 427 F.2d 561, 564–65 (1970); *Jarrett v. Resor*, 426 F.2d 213, 216 (9th Cir. 1970); *Carter v. Seamans*, 411 F.2d 767, 772–73 (5th Cir. 1969), *cert. denied*, 397 U.S. 941, 90 S.Ct. 953, 25 L.Ed.2d 121 (1970); *Ashe v. McNamara*, 355 F.2d 277, 279 (1st Cir. 1965). Consequently, the only prerequisite to 1361 jurisdiction is that the complainant show that the defendant-official owes him a nondiscretionary duty to act. If, of

---

**6.** At the eleventh hour, appellant has raised in this court two additional jurisdictional allegations—habeas corpus and section 10 of the Administrative Procedure Act, 5 U.S.C. §§ 701–06. There is a serious question whether Mr. King was in sufficient custody at the time of the filing of this action to maintain it as a petition for a writ of habeas corpus, *see Carafas v. LaVallee*, 391 U.S. 234, 236, 88

S.Ct. 1556, 20 L.Ed.2d 554 (1968). Absent more elaborate briefing of the issue by the parties and in view of my decision regarding 28 U.S.C. § 1361, I think it best to defer these questions. Neither do I see any reason to resolve appellant's APA claim, which, at best, is dubious. *See* 5 U.S.C. § 701(b)(1)(C), which states that the term "agency" does not include "the governments of the territories."

course, the duty is not "clear and indisputable," that is, not "ministerial," then mandamus simply will not lie.

Mr. King asserts that the Constitution requires that he be afforded the right to a jury trial and therefore, that the Secretary of the Interior, in the exercise of his plenary authority over the territory of American Samoa, Exec. Order 10264, 16 Fed.Reg. 6417 (1951), must provide for implementation of that right. As the discussion in part III will demonstrate, Mr. King's threshold assertion is correct—the Secretary's duty is clear, as is jurisdiction under section 1361.[7]

Before undertaking that discussion, I am constrained to comment briefly upon two additional points raised by the Government, both concerning jurisdiction. First, the Government claims that none of the lower federal courts possesses the capacity to effectuate a judgment in this case because "Samoa is outside [their] geographical reach." Gov't.Br. at 36. The simple answer is that our judgment could be effectuated by the Secretary of the Interior, over whom jurisdiction is indisputable. Having anticipated this response, the Government baldly asserts that the presence of the Secretary as a defendant does not affect the force of its initial premise, citing the solitary, unreported decision in *General Constructors Co. of Nevada v. Morton*, Civil No. 71–3409 (D.Hawaii, filed Sept. 16, 1971), Gov't Ex. A. I find this argument unpersuasive and *General Constructors* wholly inapposite. *General Constructors* was issued orally, and the district judge forthrightly expressed his concern that his treatment of the issues was colored by the expeditious nature of the proceedings. *Id.* at 1. Moreover, the decision is fully distinguishable from the instant case on several grounds: 1361 jurisdiction was not involved; no federal question was presented, since ostensibly the case concerned Samoan Government contracts and bidding procedures, *id.* at 6–11; and, the case would

have been dismissed in any event for failure to join an indispensable party, *id.* at 11. Finally, as to the Secretary of the Interior, the court merely opined that without service of process on all of his subordinates, the Secretary could not be held responsible for their acts, *id.* at 5–6.

Second, the Government raises the draconian prospect that "[u]nder plaintiff's theory of jurisdiction, the federal courts of this circuit would be compelled to hear all federally-cognizable grievances raised by both civil and criminal litigants in Samoa." Gov't.Br. at 38. Appreciative though I am of the Government's concern for our caseload, I think this jurisdictional holding is narrow and hardly encompasses "*all* federally-cognizable *grievances*" of *all* Samoan proceedings. Quite frankly, if jurisdiction to vindicate appellant's constitutional right is proper, as I think it is, then I perceive no room for the notion that the court's judgment should be swayed by "floodgate" considerations.

### III. Merits

#### A.

Article IV, section 3, clause 2 of the Constitution provides that "[t]he Congress shall have Power to dispose of and make all needful Rules and Regulations respecting the Territory or other Property belonging to the United States . . . ." The right to trial by jury in criminal prosecutions is guaranteed by article III, section 2, clause 3 of the Constitution—"The Trial of all Crimes, except in Cases of Impeachment, shall be by Jury; and such Trial shall be held in the State where the said Crimes shall have been committed; but when not committed within any State, the Trial shall be at such Place or Places as the Congress may by Law have directed;" and by the sixth amendment—"In all criminal prosecutions, the accused shall enjoy the right to a speedy and public

---

7. I note in passing that process was served on the defendant Secretary of the Interior and, that venue is proper pursuant to 28 U.S.C. § 1391(e)(1970).

trial, by an impartial jury of the State and district wherein the crime shall have been committed . . . ." Resolution of the merits of this case involves the interaction of these provisions and returns us to a jurisprudential corpus evolved at the turn of the century in response to one of the most perplexing and controversial legal issues in our Nation's history—in the vernacular of the time, whether the Constitution follows the Flag.

The issue was first presented to the Supreme Court in what are commonly known as the *Insular Cases*.[8] The earliest of those cases, *e. g., Downes v. Bidwell*, 182 U.S. 244, 21 S.Ct. 770, 45 L.Ed. 1088 (1901); *De Lima v. Bidwell*, 182 U.S. 1, 21 S.Ct. 743, 45 L.Ed. 1041 (1901), concerning the lawfulness of import tariffs on goods brought into the United States from our then newly acquired territory of "Porto Rico," left the Court sorely divided on the underlying issues.[9] One contemporaneous commentator opined that:

> The Insular Cases, in the manner in which the results were reached, the incongruity of the results, and the variety of inconsistent views expressed by the different members of the court, are, I believe, without parallel in our

judicial history. It is unfortunate that the cases could not have been determined with such a preponderance of consistent opinion as to have satisfied the profession and the country that the conclusions were likely to be adhered to by the court. Until some reasonable consistency and unanimity of opinion is reached by the court upon these questions, we can hardly expect their conclusions to be final and beyond revision.[10]

The "reasonable consistency and unanimity of opinion," lacking in the first cases, was shortly thereafter provided by the Court in *Dorr v. United States*, 195 U.S. 138, 24 S.Ct. 808, 49 L.Ed. 128 (1904).

The question presented in *Dorr* was "whether, in the absence of a statute of Congress expressly conferring the right, trial by jury is a necessary incident of judicial procedure in the Philippine Islands, where demand for trial by that method has been made by the accused, and denied by the courts established in the islands." 195 U.S. at 139, 24 S.Ct. at 809. In the course of his opinion for the Court, Mr. Justice Day initially reiterated several elementary propositions: first, "that the Constitution of the United States is the only source of power authorizing action by any branch of the Fed-

---

8. For definitional purposes, the term "Insular Cases" as used in this opinion refers to those cases decided by the Court in its 1900 and 1901 terms concerning tariffs applied to goods entering the United States from our then recently acquired territories of Puerto Rico and the Philippines, *De Lima v. Bidwell*, 182 U.S. 1, 21 S.Ct. 743, 45 L.Ed. 1041 (1901); *Goetze v. United States*, 182 U.S. 221, 21 S.Ct. 742, 45 L.Ed. 1065 (1901); *Dooley v. United States*, 182 U.S. 222, 21 S.Ct. 762, 45 L.Ed. 1074 (1901); *Armstrong v. United States*, 182 U.S. 243, 21 S.Ct. 827, 45 L.Ed. 1086 (1901); *Downes v. Bidwell*, 182 U.S. 244, 21 S.Ct. 770, 45 L.Ed. 1088 (1901); *Huus v. New York and Porto Rico Steamship Co.*, 182 U.S. 392, 21 S.Ct. 827, 45 L.Ed. 1146 (1901); *Dooley v. United States*, 183 U.S. 151, 22 S.Ct. 62, 46 L.Ed. 128 (1901); *Fourteen Diamond Rings v. United States*, 183 U.S. 176, 22 S.Ct. 59, 46 L.Ed. 138 (1901), *plus Hawaii v. Mankichi*, 190 U.S. 197, 23 S.Ct. 787, 47 L.Ed. 1016 (1903); *Dorr v. United States*, 195 U.S. 138, 24 S.Ct. 808, 49 L.Ed. 128 (1904); and *Balzac v. Porto Rico*, 258 U.S. 298, 42 S.Ct. 343, 66 L.Ed. 627

(1922). While this may not be technically correct, *De Lima v. Bidwell*, 182 U.S. at 2, 21 S.Ct. 743; *Dorr v. United States*, 195 U.S. at 135, 24 S.Ct. 808, the Court itself has subsequently utilized this characterization in reference to all of the above cases. *Reid v. Covert*, 354 U.S. 1, 12–13 and n.22, 77 S.Ct. 1222, 1 L.Ed.2d 1148; 354 U.S. at 65 n.3 (Harlan, J., concurring in result).

9. Some of the issues the Court faced in the earliest *Insular Cases* were foreshadowed in Randolph, *Constitutional Aspects of Annexation*, 12 Harv.L.Rev. 291 (1898); Langdell, *The Status of Our New Territories, id.* at 365 (1899); Baldwin, *The Constitutional Questions Incident to the Acquisition and Government by the United States of Island Territory, id.* at 393 (1899); Thayer, *Our New Possessions, id.* at 464 (1899).

10. Littlefield, *The Insular Cases*, 15 Harv.L. Rev. 169, 170 (1901). *See also The Insular Tariff Cases in the Supreme Court, id.* at 164 (1901); *The Results in the Insular Cases, id.* at 395 (1902).

eral government. 'The government of the United States was born of the Constitution, and all powers which it enjoys or may exercise must be either derived expressly or by implication from that instrument' "; second, that "the United States may acquire territory in the exercise of the treaty-making power . . .;" and third, that Congress is expressly granted by article IV, section 3 the power to govern such territory. *Id.* at 140, 24 S.Ct. at 809. Regarding the extent of Congress' power over the territories, the Court stated:

> the exercise of the power expressly granted to govern the territories is not without limitations.

> . . . . .

> The limitations which are to be applied in any given case involving territorial government must depend upon the relation of the particular territory to the United States, concerning which Congress is exercising the power conferred by the Constitution. That the United States may have territory, which is not incorporated into the United States as a body politic, we think was recognized by the framers of the Constitution in enacting the article already considered, giving power over the territories, and is sanctioned by the opinions of the justices concurring in the judgment in *Downes v. Bidwell,* [182 U.S. 244, 21 S.Ct. 770, 45 L.Ed. 1088 (1901)].

> Until Congress shall see fit to incorporate territory ceded by treaty into the United States, we regard it as settled by that decision that the territory is to be governed under the power existing in Congress to make laws for such territories, and subject to such constitutional restrictions upon the powers of that body as are applicable to the situation.

*Id.* at 142–43, 24 S.Ct. at 810. The Court then determined that the applicable treaty had not "incorporated" the Philippines into the United States and in this context, turned to the question of whether the constitutional guarantees of jury tri-

al would apply. Relying upon *Hawaii v. Mankichi,* 190 U.S. 197, 23 S.Ct. 787, 47 L.Ed. 1016 (1903), the Court held that those guarantees did not apply:

> "We would even go farther, and say that most, if not all, the privileges and immunities contained in the Bill of Rights of the Constitution were intended to apply from the moment of annexation; but we place our decision of this case upon the ground that the two rights alleged to be violated in this case [rights to trial by jury and presentment by grand jury] are not fundamental in their nature, but concern merely a method of procedure which sixty years of practice had shown to be suited to the conditions of the islands, and well calculated to conserve the rights of their citizens to their lives, their property and their well being."

*Dorr,* 195 U.S. at 144–45, 24 S.Ct. at 811, *quoting Mankichi,* at 217–18. Notably, the Court also discussed the pragmatic considerations, *i. e.,* "the uncivilized parts of the archipelago were wholly unfitted to exercise the right of trial by jury." *Id.* at 145, 24 S.Ct. at 811.

Aside from *Rassmussen v. United States,* 197 U.S. 516, 25 S.Ct. 514, 49 L.Ed. 862 (1905), which held jury trial applicable to the territory of Alaska because it had been "incorporated" into the United States, the next and final major treatment of these issues was in the Court's unanimous opinion in *Balzac v. Porto Rico,* 258 U.S. 298, 42 S.Ct. 343, 66 L.Ed. 627 (1922). Beyond its ultimate holding that the constitutional provisions regarding jury trial did not apply to the unincorporated territory of "Porto Rico," the case is important for two other reasons. First, it delineated what should and should not be considered in determining whether a territory is "incorporated" into the Union. Simply put, it resolved that "incorporation is not to be assumed without express declaration, or an implication so strong as to exclude any other view." *Id.* at 306, 42 S.Ct. at 346. No longer could incorporation be implied from acts of Congress; anything

short of an "express declaration" of Congressional intent to "incorporate" would not suffice. Second, while it is clear that the Court held, on authority of *Dorr*, that the right to jury trial was not "fundamental" and therefore not applicable in "Porto Rico," it is equally clear that this holding was made against the backdrop of the Court's perception of Puerto Rican society and culture in 1922. *Id.* at 309–11, 42 S.Ct. 343.

In sum, it can fairly be said that the *Insular Cases* stand for essentially two propositions: (1) for territories incorporated into the United States, the Constitution applies *ex proprio vigore*, and (2) for unincorporated territories, only "fundamental" constitutiona. rights apply.[11] However, the analysis cannot end here, for the *Insular Cases* were subsequently severely criticized when their reasoning resurfaced in *Reid v. Covert*, 354 U.S. 1, 77 S.Ct. 1222, 1 L.Ed.2d 1148 (1957).

The question in *Reid* was whether the constitutional guarantees of jury trial were applicable in proceedings against civilian dependents of military personnel stationed in a foreign country. In his plurality opinion answering this question affirmatively, Mr. Justice Black addressed the *Insular Cases*, reiterated their basic holdings, as discussed above, *id.* at 12–13, 77 S.Ct. 1222, and proceeded to distinguish and disapprove them:

> The "Insular Cases" can be distinguished from the present cases in that they involved the power of Congress to provide rules and regulations to govern temporarily territories with wholly dissimilar traditions and institutions whereas here the basis for governmental power is American citizenship. . . . Moreover, it is our judgment that neither the cases nor their reasoning should be given any further expansion. The concept that the Bill of Rights and other constitutional protections against arbitrary government are inoperative when they become inconvenient or when expediency dictates otherwise is a very dangerous doctrine and if allowed to flourish would destroy the benefit of a written Constitution and undermine the basis of our government. If our foreign commitments become of such nature that the Government can no longer satisfactorily operate within the bounds laid down by the Constitution, that instrument can be amended by the method which it prescribes.

*Id.* at 14, 77 S.Ct. at 1229 (footnote omitted).

Justices Frankfurter and Harlan filed separate concurring opinions in which they expressed their view, *inter alia*, that Justice Black's opinion swept too broadly in regard to the *Insular Cases*. Justice Frankfurter opined that the cases were still valuable for their analysis: "The territorial cases, in the emphasis put by them on the necessity for considering the specific circumstances of each particular case, are thus relevant in that they provide an illustrative method for harmonizing constitutional provisions which appear, separately considered, to be conflicting." *Id.* at 54, 77 S.Ct. at 1250 (Frankfurter, J., concurring in result). Implicit in this thought is approval of the *Insular Cases* for their consideration of characteristics peculiar to the relevant territories. *Id.* at 51–53, 77 S.Ct. 1222. Justice Harlan clearly agreed with this interpretation:

> [I]t seems to me that the basic teaching of *Ross* [*In re Ross*, 140 U.S. 453, 11 S.Ct. 897, 35 L.Ed. 581] and the *Insular Cases* is that there is no rigid and abstract rule that Congress, as a condition precedent to exercising power over Americans overseas, must exercise it subject to all the guarantees of the Constitution, no matter what the conditions and considerations are that would make adherence to a spe-

---

11. For an excellent analysis of the *Insular Cases* see Coudert, *The Evolution of the Doctrine of Territorial Incorporation*, 26 Colum.L. Rev. 823 (1926). *See also* P. Kauper, Constitu- tional Law 517–18 (3d ed. 1966); Note, *Inventive Statesmanship vs. The Territorial Clause: The Constitutionality of Agreements Limiting Territorial Powers*, 60 Va.L.Rev. 1041 (1974).

cific guarantee altogether impracticable and anomalous. To take but one example: *Balzac v. Porto Rico*, 258 U.S. 298, is not good authority for the proposition that jury trials need never be provided for American citizens tried by the United States abroad; but the case *is* good authority for the proposition that there is no rigid rule that jury trial must *always* be provided in the trial of an American overseas, if the circumstances are such that trial by jury would be impractical and anomalous. In other words, what *Ross* and the *Insular Cases* hold is that the particular local setting, the practical necessities, and the possible alternatives are relevant to a question of judgment, namely, whether jury trial *should* be deemed a necessary condition of the exercise of Congress' power to provide for the trial of Americans overseas.

*Id.* at 74–75, 77 S.Ct. at 1261 (Harlan, J., concurring in result).

While Justice Black's opinion did not carry a majority of the Court, I am nonetheless left with sufficient opprobrium for the *Insular Cases* to bring into question any *per se* application of them. By the same token, I find Justice Frankfurter's and Justice Harlan's analyses persuasive. To harmonize these positions, since Justice Black's primary concern was that the cases not "be given any further expansion," I think the proper methodology is to adhere to their basic tenets, as tempered by pragmatic considerations present in American Samoa and, of course, by the nature of the right to jury trial.

To complete fully the relevant legal framework within which this appeal arises, I introduce, at this point, the case which lies at the very heart of appellant's constitutional claim—*Duncan v. Louisiana*, 391 U.S. 145, 88 S.Ct. 1444, 20 L.Ed.2d 491 (1968). All of the *Insular Cases* which concern the right to jury trial were decided at a period in our

history when that right was not considered "fundamental." Obviously, *Duncan* has significantly undermined that premise. There can be no question that the right to a jury trial in serious criminal cases is now "fundamental"—" 'basic in our system of jurisprudence,' " " 'essential to a fair trial,' " and "necessary to an Anglo-American regime of ordered liberty." 391 U.S. at 149–50 and n.14, 88 S.Ct. at 1447. The relevance of *Duncan* in relation to jury trial in American Samoa will be addressed presently.

### B.

All parties agree that American Samoa is not "incorporated" into the United States. This conclusion is manifest from both the instruments of cession to the United States, and Congress' acceptance thereof.[12] It is clear that there is no express or implied declaration of incorporation in any of these documents. Hence, only fundamental constitutional rights can be applicable to American Samoa. The question is whether jury trial is such a right. Mr. King argues that *Duncan* conclusively settled the question and, since there are no additional barriers to implementation of the right, it must be done. The Government's argument to the contrary is essentially twofold: first, that *Balzac* "is still viable law [and] controlling in the present case," Gov't.Br. at 24; and second, that "sound policy" and the "public interest," evidently grounded upon Samoan cultural considerations and practical difficulties of implementing jury trials, require a contrary conclusion. *Id.* at 29–34.

While I agree that the *Balzac* analysis is still viable, I am unable to accept the notion that its holding regarding jury trial is still good law. The Government argues that "the Court in *Duncan* was clearly referring to the *Anglo-Saxon* system of justice" and that we would be in error to conclude that " 'our system of justice' . . . is synonymous with the Samoan scheme of justice." [13] I do

---

**12.** 48 U.S.C. §§ 1661, 1662 (1970). The instruments of cession are reproduced at Am.Samoa Code 6–11 (1973).

**13.** Govt.Br. at 24–25. Underlying the Government's argument is the notion that of all rights that are "fundamental," some are *more* funda-

not dispute that the Court in *Duncan* addressed the issue in terms of "Anglo-American" jurisprudence. I also concede that the majority opinion in *Duncan* did not directly carry the proposition beyond the "States," 391 U.S. at 149 n.14, 88 S.Ct. 1444, although I note that the dissent thought that it did and felt compelled to observe precisely that effect. 391 U.S. 185–86, 88 S.Ct. 1444 (Harlan, J., dissenting). Nevertheless, I believe what *Duncan* conclusively resolved is that the "nature" of the right to jury trial as embodied in the Constitution is fundamental. Obviously the decision was in terms of Anglo-American jurisprudence, but the threshold proposition in *Dorr* and *Balzac* that jury trial was *not* fundamental was *also* in terms of Anglo-American jurisprudence. The point is that the nature of the right has always been determined in the first instance with reference to our own body of law. This was so in the *Insular Cases* concerning jury trial and grand jury indictment, and explains precisely why Justice Harlan opined that *Duncan* overturned the idea that "jury trial is not fundamental to ordered liberty." *Id.* Thus, at least to that extent, *Dorr* and *Balzac* are no longer valid.

The Government has also cautioned that we would be in error "to conclude that 'our system of justice' . . . is synonymous with the Samoan scheme of justice . . . [and, to] do so would be to completely ignore the vastly different ethnic and cultural heritages of the two lands." Gov't.Br. at 25 (citation omitted). In fact, aside from the absence of jury trial, the Government has not proffered so much as *one* significant distinction between our system of criminal justice and American Samoa's. My own inquiry leads me to believe that the reason for this analytical void is that, essentially, the distinctions do not exist. Illustrative of this is title 15 of the Sa-

moan code—"Crimes & Criminal Procedure." The first approximately 50 sections set forth the "general provisions" and condemn various activity as criminal. Except for a few minor aberrations necessarily incident to the culture, *e. g.,* 15 Am.Samoa Code §§ 224, 421, the roots of these sections are plainly Anglo-American. The next few sections, concerning criminal practice and procedure generally, are particularly enlightening. Section 3301 provides that "criminal procedure in the High Court and in the district courts shall conform as nearly as may be practical to the Federal Rules of Criminal Procedure." Indeed, Rule 3 of the High Court specifically provides that "[p]roceedings in the High Court will be conducted in so far as applicable . . . in accordance with the U.S. Federal Rules of Civil and Criminal Procedure. . . . References to jury trial are specifically inapplicable in American Samoa." App. Item 8. Additionally, rights of an accused are constitutionally and statutorily protected. Section six of the Samoan Bill of Rights provides: "No person shall be . . . twice put in jeopardy of life or liberty; . . . compelled . . . to be a witness against himself . . . . In all criminal prosecutions, the accused shall have the right to a speedy and public trial, . . . to be confronted with the witnesses against him, to have compulsory process . . ., and to have the assistance of counsel. . . . Every man is presumed innocent until he is pronounced guilty by law. . . . Excessive bail shall not be required, nor excessive fines imposed nor cruel or unusual punishments inflicted." Am.Samoa Const. art. 1, § 6. *See also* 15 Am.Samoa Code § 3401. If this is not an Anglo-American system of justice, then neither is our own. What the Government has overlooked is the inherent beauty of our system—its ability to accommodate

mental than others. *See also* L. Henkin, Foreign Affairs and the Constitution, 268–69 n.75 and cases cited therein (1972) (the author does not condone this analysis, but merely poses the question). Granted that otherwise ab-

stract terms as "ordered liberty" and "fundamental" gain definition through judicial gloss, such a distinction would be questionable here, where the relevant cases, *Insular* and *Duncan*, specifically speak in terms of "fundamental."

precisely the "vastly different ethnic and cultural heritages" which the Government views as inimical to it.

Before turning to my final inquiry concerning the practical considerations of implementation of jury trial, I must comment upon the plethora of cases the Government has raised in support of its position that the *Balzac* holding is still good law. Two of the "recent decisions" cited to us as supportive of this proposition were decided *before Reid* and *Duncan,* and, in any event, are irrelevant. *American Pacific Dairy Products, Inc. v. Siciliano,* 235 F.2d 74 (9th Cir. 1956), was not even a criminal case; it concerned a civil action for damages for breach of a partnership agreement and, even as such, the jury trial issue was not exhaustively analyzed. *Figueroa v. People of Puerto Rico,* 232 F.2d 615 (1st Cir. 1956), is equally inapposite; at most, it merely restated the holding of *Balzac,* which at the time was good law. *Rivera v. Government of Virgin Islands,* 375 F.2d 988 (3rd Cir. 1967), and *Government of Virgin Islands v. Rijos,* 285 F.Supp. 126 (D.V.I.1968), are also of no aid. While both were decided after *Reid,* they were still pre-*Duncan.*[14] Moreover, their holdings concerned the right to grand jury indictment, which, unlike jury trial, has not been held "fundamental." *See also Government of the Canal Zone v. Scott,* 502 F.2d 566 (5th Cir. 1974). The Government also refers us to *Government of Virgin Islands v. Bodle,* 427 F.2d 532 (3d Cir. 1970), in which the Government says the court cited *Rijos* "with approval." Granted that *Rijos* was cited in *Bodle,* but *only* for the proposition that all aspects of the Constitution do not *ex proprio vigore* apply to unincorporated territories, and certainly not for the broad proposition asserted by the Government. *Compare* 427 F.2d at 533 n.1 *with* Gov't. Br. at 28–29. Further,

the *Bodle* court's suggestion, *in dictum,* that "trial by a jury in all criminal prosecutions is deemed a remedial right which is not among the fundamental rights" and therefore not applicable to unincorporated territories, 427 F.2d at 553 n.1, *citing Balzac,* took no cognizance whatsoever of either *Reid* or *Duncan* and certainly cannot be controlling here. *See also United States v. Dunn,* 148 U.S. App.D.C. 91, 459 F.2d 1115, 1122 (1972). Lastly, regardless of the once controlling weight of some of these cases, they have recently been subject to elaborate and critical analysis in view of *Duncan,* which I find to a large extent persuasive. *See, e. g., Montalvo v. Colon,* 377 F.Supp. 1332, 1335–42 (D.P.R.1974); *Torres v. Delgado,* 391 F.Supp. 379 (D.P.R., filed July 3, 1974), *aff'd on other grounds,* 510 F.2d 1182 (1st Cir. 1975).

In sum, I do not believe the Government's argument is correct, nor do I find persuasive the authorities offered to support it. I now turn to the remaining issue—whether Samoan cultural differences and practical considerations necessitate a conclusion that the right to jury trial is not applicable to American Samoa. In this regard, I think that the record is sufficient and see no reason or purpose in remanding the case to the district court.

The territory of American Samoa consists of a cluster of islands located in the South Pacific, approximately 4,000 nautical miles southwest of California; its geographical area is 79 square miles and 1968 estimated population was 27,000.[15] The national government is tripartite, consisting of executive, legislative and judicial branches. The Chief Executive is the Governor, who is appointed by the Secretary of the Interior[16] and performs his duties "under the general supervision" of the Secretary. There is also a

---

**14.** *Rijos,* decided June 6, 1968, technically was post-*Duncan,* decided May 20, 1968. However, since the elapsed time is only 17 days and *Rijos* makes no mention of *Duncan,* I think it safe to assume that the court in *Rijos* was realistically not aware of *Duncan.*

**15.** Hammond World Atlas 87 (1971); 16 Encyclopedia Britannica 205–07 (15th ed. 1974).

**16.** As mentioned previously, it is undisputed that the Secretary has plenary authority over the territory. 16 Fed.Reg. 6417 (July 3, 1951).

Lieutenant Governor and a Secretary of Samoan Affairs, the former appointed by the Secretary and the latter by the Governor. Any other executive officials are appointed by the Governor who is required, through the Secretary of Samoan Affairs, to request recommendations for such positions from various other local officials depending upon the particular vacancy being filled, e. g., in the case of the appointment of a district governor, the recommendation shall be requested from the relevant district council. Am.Samoa Const. art. IV, §§ 1, 2, 3, 4, 11. The legislative branch, the *Fono,* is bicameral, consisting of a 20 member House of Representatives elected by universal suffrage and an 18 member Senate "elected in accordance with Samoan custom" by the county councils of the counties they represent. *Id.* art. II, §§ 2, 4. The legislature has the "authority to pass legislation with respect to subjects of local application, except that: (a) No such legislation shall be inconsistent with [the] Constitution [of American Samoa] or the laws of the United States applicable in American Samoa . . ." *Id.* art. II, § 1. The judicial power is vested in the High Court and the district courts and is independent of the legislative and executive branches, but not independent of the Secretary of the Interior, who appoints to the High Court the Chief Justice and such Associate *Justices* as he deems necessary.[17] *Id.* art. III, §§ 1, 2, 3. Associate *Judges,* no less than five, are appointed by the Governor upon recommendation of the Chief Justice and must be confirmed by the Samoan Senate. 5 Am.Samoa Code § 204 (Supp.1974). The district courts, consisting of village magistrates elected by the village councils for terms of two years, exercise "jurisdiction only over matters

arising under the regulations of their respective villages" and, generally, "have exclusive jurisdiction to impose penalties for the violation of village regulations." 5 Am.Samoa Code §§ 601, 602.

The administration of local government is distributed among the district, county and village governing bodies. Am.Samoa Const. art. V, § 10; 4 Am.Samoa Code §§ 1 *et seq.* Notably, none of the local authorities is directly instrumental in the adjudicatory phases of the criminal justice process. Certainly they play a pivotal role in the functioning of Samoan society, but their position is clearly not akin to that of the courts. *See, e. g.,* 4 Am.Samoa Code §§ 405, 406. At this level of Samoan society the *matai,* or chieftal, system in Samoa becomes most relevant, for it is here, close to the people, that a *matai* (chief) is most influential. As leaders of the extended families (*aiga poto poto*), that communally own virtually all Samoan land, the *matais* have authority over which family members work what family land and where the nuclear families within the extended family will live. At times, the *matai* also receives, when requested, "service" in terms of money or food from the family members.[18] This has traditionally been *fa'a Samoa,* the Samoan way. Of course, the *matais* also exercise power through formalized channels as district governors, county chiefs and village mayors. 4 Am.Samoa Code §§ 3, 201, 401. *Matai* title controversies are now resolved pursuant to various statutory provisions, 1 Am.Samoa Code §§ 701–804, and a special judicial provision applies to these proceedings. 5 Am. Samoa Code § 408(e).

Examination of a relatively recent report of the Samoan Future Political Sta-

---

**17.** The Secretary's power in such appointments is virtually absolute. *See, e. g.,* Metzer, *Why I Am No Longer a Judge,* 177 The Nation 52 (1953).

**18.** For a concise analysis of the position, function and law concerning the *matai* system, from which much of the above description is drawn, see Lutali and Stewart, *A Chieftal Sys-*

*tem in Twentieth Century America: Legal Aspects of the Matai System in the Territory of American Samoa,* 4 Ga.J. Int'l & Comp.Law 387 (1974). *See also* Stewart, *American Law Below the Equator,* 59 A.B.A.J. 52 (1973); Comment, *Some Observations on the Judiciary in American Samoa,* 18 U.C.L.A.L.Rev. 581 (1971).

tus Study Commission [19] lends further color to the foregoing discussion. The Report examined alternatives to the present political status of Samoa, e. g., total independence, union with Western Samoa, and statehood. It ultimately recommended, with some alteration, retention of the present system. Some of its observations are particularly relevant here. First, it noted that, since Samoa's cession to the United States:

the inexorable pressures of the modern world [have been] chipping away at the scope and depth of tradition among the Samoan people. While social ceremonies and functions of traditional origin continue, the real meaning is often-times absent and the crucial role of tradition in the present political system is diminishing.

Today, Samoans are better educated than ever before, [education is compulsory through grade 12 or 18 years of age, 18 Am.Samoa Code § 5] and a new degree of sophistication is obvious. Samoan political opinion has shifted from passive acceptance of an appointed government to a strong desire for self-government within the American framework.

Report at 29–30. Various disadvantages to the present system were also discussed:

2. At this time, "all civil, judicial, and limitary" power in American Samoa is vested in the Secretary of the Interior. It is he, not the President or Congress, who "approved" the present Constitution of American Samoa, and presumably he could alter the present form of Government by decree.

5. Another weakness of the present system was illustrated recently when the Chief Justice was replaced by the Secretary of the Interior, despite the strong protests of the Speaker of the House of Representatives and the President of the Senate. Under the present system neither the Governor nor the judges are truly independent. The Secretary of the Interior may hire and fire without consulting the very people whose daily lives are affected by his decision.[20]

6. The present practice of appointing top officials gives rise to many potential abuses of the principle that power should be separated, checked and balanced. Not only do all the department heads owe their appointments to the Governor, who need not consult the Legislature before exercising his discretion, but the Governor could, because of his relationship with the Secretary of the Interior, cow much opposition to a controversial proposal, which might arise if the Governor's powers were more circumscribed.

Id. at 32–34. The report concluded with several recommendations designed to improve the present system: that the Governor be popularly elected; that both houses of the Samoan legislature be popularly elected; that the popularly elected Governor be given exclusive veto power over all legislation dealing with local matters; that the Samoan educational system be re-examined; that the United States Congress grant a Samoan delegate official status; and that a land title, including registration, program be instituted. Id. at 39–51. Of these, apparently only the last three have been implemented.

I have studiously examined the American Samoan government and culture, and see no reason why jury trial should not be applicable there. Contrary to the Government's argument, I do not think that jury trial in serious criminal cases would undermine any traditional cultural or societal aspects of Samoa. There is simply no indication that trial by jury, the *matai* system and Samoan culture generally are incompatible. Indeed, in view of the "supporting framework and the subsidiary procedures" presently in force throughout Samoa, I think that

19. Report from the Future Political Status Study Commission to the Eleventh Legislature of American Samoa Second Regular Session (1970), Gov't. Ex. 6 [hereafter cited as "Report"].

20. *See* note 17 *supra.* *But see* 5 Am.Samoa Code § 201. By Samoan statute, a Chief Justice or Associate Justice of the Samoan High Court "shall hold office during his good behavior but may be removed by the Secretary of the Interior for cause."

jury trial will merely complement the already existing criminal justice process. *Cf. Duncan v. Louisiana, supra,* 391 U.S. at 149 n.14, 88 S.Ct. 1444. As juries serve to curb abuses of governmental power here, a like salutary effect will be served in Samoa. *Id.* at 155–56, 88 S.Ct. 1444. I also do not perceive insurmountable physical problems to empanelling a jury, *see* App. Item 2, nor are the problems of affinity, vis-a-vis the extended families, any greater in Samoa than similar problems encountered and surmounted in closely knit areas of the United States proper. Assuming that acts of atonement for crimes committed are prevalent in Samoan culture, and may have a significant effect, *fa'a Samoa,* on a jury's determination of guilt or innocence, *see* Gov't. Ex. 7 at 6, I fail to see how this could cut against the applicability of jury trial to Samoa. After all, in the final analysis, it is the populus of a given society to whom a miscreant is responsible; and, in any event, it is apparent that if acts of atonement were not considered by the jury, they would be considered by the judge in his sentencing decision. 15 Am.Samoa Code § 5004. Hence, I find none of the cultural differences or practical considerations which the Government poses in opposition to jury trial sufficient to warrant inapplicability of the right.[21] Quite frankly, American Samoa in 1975 and "Porto Rico" in 1922 are simply not analogous.

### IV. Conclusion

This case has presented a variety of difficult questions, both in terms of its legal analysis and potential application. I have determined, through an analysis which accommodates evolving Supreme Court doctrine, that the right to a jury trial in serious criminal cases as guaranteed by our Constitution is applicable to our territory of American Samoa.[22] Mr. King was convicted of a serious criminal offense without being accorded this constitutional right. His conviction should not be allowed to stand. Thus, I would reverse the judgment of the district court, and remand the case with instructions to enter judgment for the plaintiff-appellant and to grant appropriate relief.

---

**21.** Of course, it does not necessarily follow that defendants convicted without benefit of a jury trial have been wronged. *See DeStefano v. Woods,* 392 U.S. 631, 88 S.Ct. 2093, 20 L.Ed.2d 1308 (1968).

**22.** This holding would not require that every aspect of the federal jury system be engrafted onto the Samoan criminal justice process. The standard is that only fundamental rights be accorded. The Supreme Court has held that neither a twelve-person nor unanimous jury is fundamental. *See Apodaca v. Oregon,* 406 U.S. 404, 92 S.Ct. 1628, 32 L.Ed.2d 184 (1972); *Williams v. Florida,* 399 U.S. 78, 90 S.Ct. 1893, 26 L.Ed.2d 446 (1970). Thus, for example, neither aspect would necessarily have to be implemented in Samoa. Beyond that, I express no opinion as to the specific type of jury trial required; that is properly an issue to be resolved in the first instance between the Secretary and the Samoan Government.

I also stress that this holding would apply only to criminal prosecutions for "serious offenses." *See, Baldwin v. New York,* 399 U.S. 66, 90 S.Ct. 1886, 26 L.Ed.2d 437 (1970). There can be no question that Mr. King was prosecuted for such an offense. *Id.* at 69, 90 S.Ct. 1886.