## PETER HAND CO. et al. v. UNITED STATES.

(Circuit Court of Appeals, Seventh Circuit. July 19, 1924. Rehearing Denied November 3, 1924.)

No. 3410.

**1. Intoxicating liquors ⟨⟩278—Operation under special permit from court to manufacture and dispose of certain materials not abatement.**

It was not an abatement of nuisance under National Prohibition Act (Comp. St. Ann. Supp. 1923, § 10138¼ et seq.) that defendants' property was under court's surveillance through marshal with search warrant, and that defendants were operating under special permit from the court to manufacture and dispose of certain materials.

**2. Courts ⟨⟩347 — Corporation officers and agents admitted that they were in active control of corporation's property by failure to deny such fact.**

In proceeding against corporation and its officers and agents to abate nuisance under National Prohibition Act (Comp. St. Ann. Supp. 1923, § 10138¼ et seq.), the officers and agents admitted they were in active control by failure to deny such fact, under federal equity rule No. 30.

**3. Intoxicating liquors ⟨⟩275—Evidence held to show sale in proceeding to abate nuisance.**

In proceeding to abate nuisance under National Prohibition Act (Comp. St. Ann. Supp. 1923, § 10138¼ et seq.), evidence *held* to show sale.

**4. Intoxicating liquors ⟨⟩275—Evidence held insufficient to prove right to manufacture under government permit.**

In proceedings to abate liquor nuisance, evidence *held* insufficient to show defendant's right to manufacture under government permit.

**5. Intoxicating liquors ⟨⟩275 — Defendants, who claimed right to manufacture under government permit, had burden of proving permit and compliance therewith.**

In proceeding to abate nuisance under National Prohibition Act (Comp. St. Ann. Supp. 1923, § 10138¼ et seq.), defendants, claiming right to manufacture under government permit, had burden of proving that they had a permit, and that the liquor manufactured, sold, or withdrawn contained less than one-half of 1 per cent. of alcohol by volume, in view of title 2, § 37 (Comp. St. Ann. Supp. 1923, § 10138½x).

**6. Corporations ⟨⟩519(3)—Evidence held to prove knowledge by corporation's officers of violations of National Prohibition Act on corporation's premises.**

In proceeding to abate nuisance under National Prohibition Act (Comp. St. Ann. Supp. 1923, § 10138¼ et seq.), in which defendant corporation claimed the right to manufacture near beer and to dealcoholize real beer under government permit, evidence *held* to prove knowledge of corporation's officers of violations of act.

**7. Constitutional law ⟨⟩312—Intoxicating liquors ⟨⟩21—Provision of National Prohibition Act for abatement of nuisance held not violative of due process clause.**

National Prohibition Act, tit. 2, § 22 (Comp. St. Ann. Supp. 1923, § 10138½k), providing for abatement of liquor nuisance, *held* not violative of due process clause.

2 F.(2d)—29

**8. Constitutional law ⟨⟩10 — Amendment to United States Constitution, ratified by Legislatures without submission to people, valid.**

Const. U. S. Amend. 18, though ratified by the Legislatures of the various states without submission to the people, *held* valid.

Appeal from the District Court of the United States for the Eastern Division of the Northern District of Illinois.

Proceeding by United States against the Peter Hand Company and others to abate a nuisance under the National Prohibition Act. From a decree awarding injunction, defendants appeal. Affirmed.

Emil C. Wetten and Benjamin P. Epstein, both of Chicago, Ill., for appellants.

Jacob I. Grossman, of Chicago, Ill., for the United States.

Before EVAN A. EVANS and PAGE, Circuit Judges, and FITZHENRY, District Judge.

PAGE, Circuit Judge. This is an appeal from a decree awarding an injunction to abate a nuisance under the National Prohibition Act (Comp. St. Ann. Supp. 1923, § 10138¼ et seq.). The defendants (appellants) urge several reasons why the bill should have been dismissed at the close of the trial, for failure to prove material allegations.

[1] The record shows that the marshal entered the premises under a search warrant, and that thereafter defendants were operating under a special permit from the court to manufacture and dispose of certain materials on hand. It is claimed that thereby the nuisance, if any had existed, was abated. No authorities are cited, and it is not made clear why defendants, whose property was under surveillance of the court, through its marshal with a search warrant, can be heard to say that as to them the nuisance was abated because they were allowed to operate for special and limited purposes under the court's special permit.

[2] It is contended that there is no proof that the individual defendants were in active control of the business. All defendants filed answers, the individual defendants answering in their individual capacities and as officers and agents of the corporation. From the record it appears that John F. Heuer was president and treasurer, Joseph Watry secretary, Harry P. Heuer vice president, and George Schled brewmaster. There was no denial that they were in active control, as charged, and, under federal equity rule 30, if such matters are not denied, the bill is, as to them, taken as confessed.

[3] The contention that there is no evidence of a sale is not well taken. The testimony of the witness Nottoli is that he got a truck load of beer at the brewery from Grasso. He knew Grasso so intimately that he called him Eddie, describes him as manager, and says he paid him for the beer.

[4, 5] It is urged that the charge of manufacture is not sustained, because it is said that the government's testimony shows that "defendant corporation had a right to manufacture under a government permit." Defendants were permitted to ask, on cross-examination of a prohibition agent, whose business it seems to have been to watch breweries and not to issue permits, if the brewery had a permit, and he said that it had, to which he added, on suggestion of the district attorney, "so far as I know." This is very unsubstantial proof of a permit, which, if there was one, was in the possession of the brewery. Whether the witness referred to the special permit from the court is not clear; but, if the brewery was operating under a license, there is positive evidence in the record that it sold real beer and that it violated the law on May 23, 1923. Later in the year, in some containers where the brewmaster said there was near beer, real beer was found. It was the duty of the defendants to keep within the law, and when they accepted the permit, if they had one, they accepted the burdens and obligations cast upon them by the law. Section 37 of title 2 of the Volstead Act (Comp. St. Ann. Supp. 1923, § 10138½x) provides:

"In any case where the manufacturer is charged with manufacturing or selling for beverage purposes any malt, vinous, or fermented liquids containing one-half of 1 per centum or more of alcohol by volume, or in any case where the manufacturer, having been permitted by the commissioner to develop a liquid such as ale, beer, porter, or wine containing more than one-half of 1 per centum of alcohol by volume in the manner and for the purpose herein provided, is charged with failure to reduce the alcoholic content of any such liquid below such one-half of 1 per centum before withdrawing the same from the factory, then in either such case the burden of proof shall be on such manufacturer to show that such liquid so manufactured, sold, or withdrawn contains less than one-half of 1 per centum of alcohol by volume. In any suit or proceeding involving the alcoholic content of any beverage, the reasonable expense of analysis of such beverage shall be taxed as costs in the case."

One accepting a permit under the provisions of the act may not be heard to say that he is not bound by the terms of the act. The burden was upon defendants to show that they had a permit, and that the liquid manufactured, sold, or withdrawn contained less than one-half of 1 per cent. of alcohol by volume.

[6] It is also urged that there is no evidence to show that the corporation or any of its agents or officers knew of the alleged violation of May 23, 1923. One of the men who got beer on that occasion went there at 4:30 in the afternoon, and did not leave until 2:30 or later in the morning. There is evidence that one or more of the officers were there. One with a vivid imagination may see ways in which unauthorized persons may pillage the property of another, take away and remove it without his knowledge or consent, but the evidence repels any such conclusion in this case. It is the duty of a corporation and its officers, having a permit under the Prohibition Act to dealcoholize, to see to it that the privileges they have are not made the basis of law violations. Here the evidence shows that at 4:30 in the afternoon at least half a dozen trucks and many men went into the brewery of defendant, without force, loaded the trucks with real beer, and then were not permitted to leave, but played cards until 2:30 in the morning, when they left on direction from some one inside the brewery. That the officers were ignorant of such a situation is unbelievable. Defendants put but one witness on the stand, who testified only as to the question of property value. The case is supported by the uncontradicted testimony of the government witnesses and many facts and circumstances shown in the evidence, from which the inferences to be drawn are not favorable to the defendants.

In one instance, it appears that a large number of barrels of real beer were found upon the premises. Notwithstanding the fact that there appears to have been good empty vats into which the beer might have been placed, the claim is urged that it was put into barrels because of a broken vat. The evidence shows that the near beer and the real beer vats were so close together that in barreling the change from near to real beer might have been accomplished by the shifting of one end of a hose from the near beer vat to the real beer vat, a condition not calculated to ward off suspicion nor to ally it when once aroused.

Again, from ordinary fences surrounding the premises there grew, from time to time,

high board fences, surmounted with barbed wire entanglements, which were carried to roofs, sheds, and buildings, that were so low as to possibly afford access to the brewery. On an occasion in 1923, when the officers visited the plant and asked the privilege of making an inspection in connection with the issuance or cancellation of a government permit, which does not appear, the officers were refused the privilege of making the inspection. Without giving too much weight to these circumstances, we are of opinion that they do not show much anxiety on the part of the defendants to keep within the law.

Two constitutional questions are raised:

[7] First. That section 22 of the National Prohibition Act (Comp. St. Ann. Supp. 1923, § 10138½k) authorizes the court to "penalize and punish" defendants by depriving them of their property without due process of law. This question has been many times decided adversely to defendants' contention. U. S. v. Boynton (D. C.) 297 F. 261, 266, and authorities there cited.

[8] Second. That by the enactment of the Fourteenth Amendment the method of making amendments to the Constitution has been so changed that such amendments thereafter might no longer be submitted to or passed upon by the Legislatures of the various states, but could and now can lawfully be submitted only to the people, and that because of the failure to so submit the Eighteenth Amendment it has never been adopted. The exact idea of defendants seems to be embraced in the following from their brief:

"The framers of the Constitution wanted to subordinate the *states* and magnify the *people* and make them *national* citizens rather than *state* citizens, but the framers, while giving abundant evidence of their 'intention' in the preamble of the Constitution, as a matter of fact, failed to completely record that fact, and it therefore required the Fourteenth Amendment to fully *nationalize the people* and absolutely get away from the idea of a federation of states and state rights."

Defendants refer to McCulloch v. Maryland, 4 Wheat. 316, quoting from page 402, 4 L. Ed. 579, as illustrative of the source from which this court may obtain an understanding of the principles contended for. It is difficult to conceive of a clearer statement wholly contradictory to the contention urged by defendants than is contained in the language quoted by them. The very thing which Chief Justice Marshall was refuting was the contention made by the Attorney General of Maryland that the Constitution should be considered as emanating not from the people, but as the act of sovereign or independent states. He said:

"The convention which framed the Constitution was indeed elected by the state Legislatures. But the instrument, when it came from their hands, was a mere proposal, without obligation, or pretensions to it. It was reported to the then existing Congress of the United States, with a request that it might 'be submitted to a convention of delegates, chosen in each state by the people thereof, under the recommendation of its Legislature, for their assent and ratification.' This mode of proceeding was adopted; and by the convention, by Congress, and by the state Legislatures, the instrument was submitted to the people. * * * From these conventions the Constitution derives its whole authority. The government proceeds directly from the people, is 'ordained and established' in the name of the people. * * * But the people were at perfect liberty to accept or reject it, and their act was final. It required not the affirmance, and could not be negatived, by the state governments. * * * The powers delegated to the state sovereignties were to be exercised by themselves, not by a distinct and independent sovereignty created by themselves. To the formation of a league, such as was the Confederation, the state sovereignties were certainly competent. But when, 'in order to form a more perfect union,' it was deemed necessary to change this alliance into an effective government, possessing great and sovereign powers, and acting directly on the people, the necessity of referring it to the people, and of deriving its powers directly from them, was felt and acknowledged by all. The government of the Union, then, * * * is, emphatically and truly, a government of the people. In form and in substance, it emanates from them."

That decision evidences the fact that the highest judicial authority of the Union was far away from the idea of a federation of states half a century before the advent of the Fourteenth Amendment.

Defendants further say in their briefs:

"Unfortunately a most careful and painstaking search of the Constitution emphasizes the fact that its authors had entirely overlooked defining just what body of citizens should constitute the *people* who were to be in this *union*, and realizing the necessity of protecting against aliens, infants, incompetents, etc., and in order to force the Southern States into a position of proper

subjugation, and to forever put at rest their contention for state rights, the Fourteenth Amendment was adopted, which provided that 'all persons born or naturalized in the United States and subject to the jurisdiction thereof, are citizens of the United States. * * *,"

While it is true that the Constitution did not define "what body of citizens should constitute the people who were to be in this union," it is by no means true that the nation's citizenship was undefined or unknown. Under the Articles of Confederation, which preceded the Constitution, there was a confederation of the several states. Article 4 of the Confederation provided, as to citizenship:

"The better to secure and perpetuate mutual friendship and intercourse among the people of the different states in this Union, the free inhabitants of each of these states (paupers, vagabonds, and fugitives from justice excepted) shall be entitled to all privileges and immunities of free citizens in the several states."

From the time of the adoption of the Constitution it became necessary in many cases to determine whether an individual in a given case was a citizen of the United States. In U. S. v. Wong Kim Ark, 169 U. S. 649, 18 S. Ct. 456, 42 L. Ed. 890, there is a very full examination of the authorities and discussion of the question as to what then constituted citizenship in the United States. In the Dred Scott Case, 60 U. S. (19 How.) 393, 404 (15 L. Ed. 691), the Supreme Court said:

"The words 'people of the United States' and 'citizens' are synonymous terms, and mean the same thing. They both describe the political body who, according to our republican institutions, form the sovereignty, and who hold the power and conduct the government through their representatives. They are what we familiarly call the 'sovereign people,' and every citizen is one of this people, and a constituent member of this sovereignty."

That was in 1856, before the adoption of the Fourteenth Amendment. In 1891, after the enactment . of the Fourteenth Amendment, in Boyd v. Thayer, 143 U. S. 135, 159, 12 S. Ct. 375, 36 L. Ed. 103, the Supreme Court quoted and adopted the above definition from the Dred Scott Case. Judge Cooley, in his work on Constitutional Limitations, said:

"The people, in a legal sense, must be understood to be those who, by the existing Constitution, are crowned with political rights, and who, while that instrument remains, will be the sole organs through which the will of the body politic will be expressed."

It clearly appears that the people of the United States are the same since the adoption of the Fourteenth Amendment as they were at the adoption of the Constitution; that is, they are "the political body who, according to our republican institutions, form the sovereignty, and who hold the power and conduct the government through their representatives."

Through naturalization and through the Fourteenth Amendment, and possibly by treaties, others have been brought into citizenship and have become a part of the people. The Constitution (article 1, § 8, cl. 4) gave to Congress the power to establish a uniform rule of naturalization, which Congress did on March 26, 1790. Many have been admitted to citizenship under that and subsequent naturalization laws.

The Thirteenth, Fourteenth, and Fifteenth Amendments were adopted to give former slaves, negroes, a legal status as citizens of the United States and of the several states in which they resided, and to protect them in those rights. In re Kemmler, 136 U. S. 436, 448, 10 S. Ct. 930, 934 (34 L. Ed. 519) the Supreme Court said:

"The Fourteenth Amendment did not radically change the whole theory of the relations of the state and federal governments to each other, and of both governments to the people."

In Hawke v. Smith, 253 U. S. 221, 40 S. Ct. 495, 64 L. Ed. 871, 10 A. L. R. 1504, the contention was made that the right existed under the laws of the state of Ohio to submit the question of the adoption of the Eighteenth Amendment to the people on a referendum. The Supreme Court said:

"The Fifth Article is a grant of authority by the people to Congress. The determination of the method of ratification is the exercise of a national power specifically granted by the Constitution; that power is conferred upon Congress, and is limited to two methods, by action of the Legislatures of three-fourths of the states, or conventions in a like number of states. Dodge v. Woolsey, 18 How. 331, 348. The framers of the Constitution might have adopted a different method. Ratification might have been left to a vote of the people, or to some authority of government other than that selected. The language of the article is plain and admits of no doubt in its interpretation. * * * All of the amendments to the Con-

stitution have been submitted with a requirement for legislative ratification; by this method all of them have been adopted."

Hawke v. Smith, supra, was approved in Leser v. Garnett, 258 U. S. 130, 137, 42 S. Ct. 217, 66 L. Ed. 505.

The Sixteenth Amendment was proposed in 1909, the Seventeenth in 1912, and both were submitted to and approved by the Legislatures of the several states, and have since been accepted and held to be legal constitutional amendments. Curiously enough, defendants cite the Seventeenth Amendment as a legal taking away of the rights of the Legislatures to elect a United States Senator, saying that it "expressly, directly and specifically took away from the state Legislatures the right to elect United States Senators, showing conclusively that there is nothing sacred about a state Legislature and that it possesses no inalienable rights."

We presume that that was cited as a valid existing amendment, but if there is anything in defendants' contention there is no Seventeenth Amendment.

We are of opinion that the objections urged to the constitutionality of the Eighteenth Amendment are wholly without merit. Other assignments are not deemed of importance.

The decree is affirmed.