# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued February 9, 2015        Decided June 5, 2015

No. 13-5272

LENEUOTI FIAFIA TUAUA, ET AL.,
APPELLANTS

v.

UNITED STATES OF AMERICA, ET AL.,
APPELLEES

AMERICAN SAMOA GOVERNMENT AND AUMUA AMATA,
INTERVENORS

———

Appeal from the United States District Court
for the District of Columbia
(No. 1:12-cv-01143)

———

*Neil C. Weare* argued the cause for appellants. With him on the briefs were *Robert J. Katerberg*, *Murad S. Hussain*, *Elliott C. Mogul*, and *Dawn Y. Yamane Hewett*.

*Jessica Ring Amunson* and *Erica L. Ross* were on the brief for *amicus curiae* David B. Cohen in support of appellants.

*David J. Debold* and *Molly M. Claflin* were on the brief for *amici curiae* Citizenship Scholars in support of appellants.

*Eugene D. Gulland* was on the brief for *amici curiae* Certain Members of Congress and Former Government Officials in support of appellants.

*Krim M. Ballentine*, filed the brief as *amicus curiae* in support of appellant.

*Wynne P. Kelly*, Assistant U.S. Attorney, argued the cause for appellees.  With him on the brief were *Ronald C. Machen Jr.*, U.S. Attorney, and *R. Craig Lawrence*, Assistant U.S. Attorney.

*Michael F. Williams* argued the cause and filed the brief for intervenors for appellee American Samoa Government and Congresswoman Aumua Amata.

*Paul R.Q. Wolfson*, *Dina B. Mishra*, and *Adam I. Klein* were on the brief for *amici curiae* Scholars of Constitutional Law and Legal History in support of neither party.

Before: BROWN, *Circuit Judge*, and SILBERMAN and SENTELLE, *Senior Circuit Judges*.

BROWN, *Circuit Judge*:  In our constitutional republic, Justice Brandeis observed, the title of citizen is superior to the title of President.  Thus, the questions "[w]ho is the citizen[?]" and "what is the meaning of the term?" Aristotle, *Politics* bk. 3, *reprinted in part in* READINGS IN POLITICAL PHILOSOPHY 55, 61 (Francis W. Coker ed., 1938), are no less than the questions of "who constitutes the sovereign state?" and "what is the meaning of statehood as an association?" We are called upon to resolve one narrow circumstance implicating these weighty inquiries.  Appellants are individuals born in the United States territory of American

Samoa. Statutorily deemed "non-citizen nationals" at birth, they argue the Fourteenth Amendment's Citizenship Clause affords them citizenship by dint of birthright. They are opposed not merely by the United States but by the democratically elected government of the American Samoan people. We sympathize with Appellants' individual plights, apparently more freighted with duty and sacrifice than benefits and privilege, but the Citizenship Clause is textually ambiguous as to whether "in the United States" encompasses America's unincorporated territories and we hold it "impractical and anomalous," *see Reid v. Covert*, 354 U.S. 1, 75 (1957), to impose citizenship by judicial fiat—where doing so requires us to override the democratic prerogatives of the American Samoan people themselves. The judgment of the district court is affirmed; the Citizenship Clause does not extend birthright citizenship to those born in American Samoa.

## I

The South Pacific islands of American Samoa have been a United States territory since 1900, when the traditional leaders of the Samoan Islands of Tutuila and Aunu'u voluntarily ceded their sovereign authority to the United States Government. *See* Instrument of Cession by the Chiefs of Tutuila Islands to United States Government, U.S.-Tutuila, Apr. 17, 1900. Today the American Samoan territory is partially self-governed, possessing a popularly elected bicameral legislature and similarly elected governor.[1] Complaint at 13 ¶ 27, Tuaua v. United States, 951 F. Supp. 2d

---

[1] Although it possesses significant institutions of local self-governance American Samoa is classified as a "non-self-governing territory" by the United Nations General Assembly. *See generally* U.N. Charter ch. XI.

88 (D.D.C. 2013) (No. 12-cv-01143). The territory, however, remains under the ultimate supervision of the Secretary of the Interior. *See* Exec. Order No. 10,264 (June 29, 1951) (transferring supervisory authority from the Secretary of the Navy to the Secretary of the Interior).

Unlike those born in the United States' other current territorial possessions—who are statutorily deemed American citizens at birth—section 308(1) of the Immigration and Nationality Act of 1952 designates persons born in American Samoa as non-citizen nationals.[2] *See* 8 U.S.C. § 1408(1). Below, Appellants challenged section 308(1), as well as State Department policies and practices implementing the statute, *see, e.g.*, 7 FAM § 1125.1(b), on Citizenship Clause grounds and under the Administrative Procedure Act. The district court rejected Appellants' arguments and dismissed the case for failure to state a claim upon which relief can be granted. *Tuaua v. United States*, 951 F. Supp. 2d 88, 94 (D.D.C. 2013); *see also* FED. R. CIV. P. 12(b)(6). On appeal Appellants reassert only their constitutional claim. Our review is de novo. *Atherton v. D.C. Office of Mayor*, 567 F.3d 672, 681 (D.C. Cir. 2009).

**II**

The Citizenship Clause of the Fourteenth Amendment provides that "[a]ll persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside." U.S. CONST. amend. XIV, § 1, cl. 1. Both Appellants and the

---

[2] Persons born in the Philippines during the territorial period, which ended in 1946, were likewise statutorily designated non-citizen nationals.

United States government[3] agree the text and structure of the Fourteenth Amendment unambiguously leads to a single inexorable conclusion as to whether American Samoa is within the United States for purposes of the clause. They materially disagree only as to whether the inescapable conclusion to be drawn is whether American Samoa "is" or "is not" a part of the United States. *See generally* JOHN BARTLETT, BARTLETT'S FAMILIAR QUOTATIONS (17th ed. 2002) ("The devil is in the detail[s].").

## A

Appellants rely on a comparison of the first and second clauses of the Fourteenth Amendment—the Citizenship and Apportionment Clauses, respectively. They argue the former is framed expansively through use of the overarching term "in the United States," U.S. CONST. amend. XIV, § 1, cl. 1, while the latter speaks narrowly in terms of apportionment of representatives "among the several *States*," U.S. CONST. amend. XIV, § 1, cl. 2 (emphasis added). In contrast, the Appellees look to differences between the Thirteenth and Fourteenth Amendment.[4] Partly relying on dictum from

---

[3] Unlike the United States Government, Intervenors—the American Samoan Government and Congressman Faleomavaega— exclusively argue Appellants' interpretation is foreclosed by precedents from the Insular case line.

[4] The United States Government also argues, "even if Plaintiffs were correct that . . . the Fourteenth Amendment should generally confer birthright citizenship[,] . . . Congress's direct modification of that status by statute trumps that interpretation." Brief of Respondent-Appellee at 26, No. 13-5272 (D.C. Cir. Aug. 11, 2014) (relying on *Rogers v. Bellei*, 401 U.S. 815, 828 (1971)). This argument is novel, if curious. Yet it erroneously conflates Congress's broad powers over naturalization with authority to statutorily abrogate the scope of birthright citizenship available

Justice Brown's judgment for the Supreme Court in *Downes v. Bidwell*, 182 U.S. 244 (1901), the United States Government argues the Thirteenth Amendment prohibits slavery "within the United States, *or any place subject to their jurisdiction*," *id.* at 251 (emphasis added), while the Fourteenth Amendment's Citizenship Clause applies to persons "born . . . in the United States, *and* subject to the jurisdiction thereof," *id.* (emphasis added). According to the Government the Thirteenth Amendment's phraseology contemplates areas "not a part of the Union, [which] [a]re still subject to the jurisdiction of the United States," while the Fourteenth Amendment incorporates a "limitation to persons born or naturalized in the United States, which is not extended to persons born in any place 'subject to their jurisdiction.'" *Id.*

Neither argument is fully persuasive, nor does it squarely resolve the meaning of the ambiguous phrase "in the United States." The text and structure alone are insufficient to divine the Citizenship Clause's geographic scope. The difference between the Citizenship and Apportionment Clauses could suggest the former has a broader reach than the latter. *See United States v. Diaz-Guerrero*, 132 F. App'x 739, 740–41 (9th Cir. 2005) ("It is a well-established canon of statutory interpretation that the use of different words or terms within a statute demonstrates . . . [intent] to convey a different meaning for those words . . . ."). But, even if this is the case, Appellants' argument does not resolve the question at issue because both text and structure are silent as to the precise contours of the "United States" under the Citizenship Clause.

---

under the Constitution itself. Congress's authority for the latter is wanting. *See generally Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 178 (1803) ("[T]he constitution is superior to any ordinary act of the legislature.").

Even if "United States" is broader than "among the several States," it remains ambiguous whether territories situated like American Samoa are "within" the United States for purposes of the clause. The Government's argument is similarly incomplete. While the language of the Thirteenth Amendment may be broader than that found in the Citizenship Clause, this comparison yields no dispositive insight as to whether the Citizenship Clause's use of the term "United States" includes American Samoa or similarly situated territories.

Appellants rely on scattered statements from the legislative history to bolster their textual argument. *See, e.g.*, CONG. GLOBE, 39TH CONG., 1ST SESS. 2890, 2894 (1866) ("[The Citizenship Clause] refers to persons everywhere, whether in the States, or in the Territories or in the District of Columbia.") (statement of Sen. Trumbull). "[T]he legislative history of the Fourteenth Amendment . . . like most other legislative history, contains many statements from which conflicting inferences can be drawn . . . ." *Afroyim v. Rusk*, 387 U.S. 253, 267 (1967). Here, and as a general matter, "[i]solated statements . . . are not impressive legislative history." *Garcia v. United States*, 469 U.S. 70, 78 (1984).

**B**

Appellants and Amici Curiae further contend the Citizenship Clause must—under Supreme Court precedent—be read in light of the common law tradition of *jus soli* or "the right of the soil." *See United States v. Wong Kim Ark*, 169 U.S. 649, 654 (1898) ("The constitution nowhere defines the meaning of . . . [the word "citizen"], either by way of inclusion or of exclusion, except in so far as this is done by the affirmative declaration that 'all persons born or naturalized in the United States, and subject to the jurisdiction

thereof, are citizens of the United States.'  In this, as in other respects, it must be interpreted in the light of the common law, the principles and history of which were familiarly known to the framers of the constitution.") (internal citation omitted).

The doctrine of *jus soli* is an inheritance from the English common law.  Those born "within the King's domain" and "within the obedience or ligeance of the King" were subjects of the King, or "citizens" in modern parlance.  *See Calvin's Case*, 77 Eng. Rep. 377, 399 (1608).  The domain of the King was defined broadly.  It extended beyond the British Isles to include, for example, persons born in the American colonies. *Inglis v. Trustees of Sailor's Snug Harbor*, 28 U.S. (3 Pet.) 99, 120–21 (1830).

After independence the former colonies continued to look to the English common law rule.  *See, e.g.*, *id.* at 164–65. Following the Constitution's ratification the principal exception to *jus soli* was for African Americans born in the United States, *see Dred Scott v. Sanford*, 60 U.S. (19 How.) 393, 404–05 (1857); an exception necessarily repudiated with the ratification of the Fourteenth Amendment.[5]  Relying on the Supreme Court's opinion in *United States v. Wong Kim Ark*, 169 U.S. 649, Appellants and Amici Curiae accordingly argue the geographic scope of the Fourteenth Amendment's Citizenship Clause should be read expansively as the

---

[5] During the pre-constitutional period of confederation, "[p]aupers, vagabonds and fugitives from justice" were excepted from the "privileges and immunities of free citizens *in the several States*." ARTICLES OF CONFEDERATION, art. IV (emphasis added).  It was only after "the adoption of the Constitution [that] it became necessary in many cases to determine whether an individual in a given case was a citizen of the *United States*."  *Peter Hand Co. v. United States*, 2 F.2d 449, 452 (7th Cir. 1924) (emphasis added).

"domain" of the sovereign under background *jus soli* principles.

We are unconvinced, however, that *Wong Kim Ark* reflects the constitutional codification of the common law rule as applied to outlying territories. As the Ninth Circuit noted in *Rabang v. INS*, the expansive language of *Wong Kim Ark* must be read with the understanding that the case "involved a person born in San Francisco, California. The fact that he had been born 'within the territory' of the United States was undisputed, and made it unnecessary to define 'territory' rigorously or decide whether 'territory' in its broader sense meant 'in the United States' under the Citizenship Clause." 35 F.3d 1449, 1454 (9th Cir. 1994); *accord Nolos v. Holder*, 611 F.3d 279, 284 (5th Cir. 2010); *Valmonte v. INS*, 136 F.3d 914, 920 (2d Cir. 1998).[6] "It is a maxim, not to be disregarded, that general expressions, in every opinion, are to be taken in connection with the case in which those expressions are used. If they go beyond the case, they may be respected, but ought not to control the judgment in a subsequent suit when the very point is presented for decision." *Wong Kim Ark*, 169 U.S. at 679.

---

[6] Because it may also bear upon the impractical and anomalousness inquiry, we note the vast practical consequences of departing from our sister circuits' decisions. Despite Appellants' contentions to the contrary, there is no material distinction between nationals born in American Samoa and those born in the Philippines prior to its independence in 1946. *Contra* Brief for Petitioner-Appellant at 42–43 (attempting to distinguish the Philippines context because that territory was acquired via conquest and because it was always the purpose of the United States to eventually withdraw its sovereignty). The extension of citizenship to the American Samoan people would necessarily implicate the United States citizenship status of persons born in the Philippines during the territorial period—and potentially their children through operation of statute.

And even assuming the framers intended the Citizenship Clause to constitutionally codify *jus soli* principles, birthright citizenship does not simply follow the flag. Since its conception *jus soli* has incorporated a requirement of allegiance to the sovereign. To the extent *jus soli* is adopted into the Fourteenth Amendment, the concept of allegiance is manifested by the Citizenship Clause's mandate that birthright citizens not merely be born within the territorial boundaries of the United States but also "subject to the jurisdiction thereof," U.S. CONST. amend. XIV, § 1, cl. 1; *see Wong Kim Ark*, 169 U.S. at 655 ("The principle embraced all persons born within the king's allegiance, and subject to his protection. . . . Children, born in England, of [] aliens, were [] natural-born subjects. But the children, born within the realm, of foreign ambassadors, or the children of alien enemies, born during and within their hostile occupation of part of the king's dominions, were not natural-born subjects, because not born within the allegiance, the obedience, or the power, or, as would be said at this day, within the jurisdiction, of the king.").

Appellants would find any allegiance requirement of no moment because, as non-citizen nationals, American Samoans already "owe[] permanent allegiance to the United States." 8 U.S.C. § 1101(a)(22); *see also Sailor's Snug Harbor*, 28 U.S. at 155 ("[A]llegiance is nothing more than the tie or duty of obedience of a subject to the sovereign under whose protection he is; and allegiance by birth, is that which arises from being born within the dominions and under the protection of a particular sovereign."). Yet, within the context of the Citizenship Clause, "[t]he evident meaning of the[] . . . words ["subject to the jurisdiction thereof"] is, not merely subject in some respect or degree to the jurisdiction of the United States, but *completely* subject to their political

jurisdiction, and owing them direct and immediate allegiance." *Elk v. Wilkins*, 112 U.S. 94, 102 (1884) (emphasis added). It was on this basis that the Supreme Court declined to extend constitutional birthright citizenship to Native American tribes. *See id.* at 99 ("The Indian tribes, being within the territorial limits of the United States, were not, strictly speaking, foreign states; but they were alien nations, distinct political communities . . . ."). As even the dissent to *Elk* recognized, "it would be obviously inconsistent with the semi-independent character of such a tribe, and with the obedience they are expected to render to their tribal head, that they should be vested with the complete rights—or, on the other, subjected to the full responsibilities—of American citizens. It would not for a moment be contended that such was the effect of this amendment." *Id.* at 119–20 (Harlan, J., dissenting). Even assuming a background context grounded in principles of *jus soli*, we are skeptical the framers plainly intended to extend birthright citizenship to distinct, significantly self-governing political territories within the United States's sphere of sovereignty—even where, as is the case with American Samoa, ultimate governance remains statutorily vested with the United States Government. *See Downes*, 182 U.S. at 305 (White, J., concurring) (doubting citizenship naturally and inevitably extends to an acquired territory regardless of context).

### III

Analysis of the Citizenship Clause's application to American Samoa would be incomplete absent invocation of the sometimes contentious Insular Cases, where the Supreme Court "addressed whether the Constitution, by its own force, applies in any territory that is not a State." *Boumediene v. Bush*, 553 U.S. 723 (2008). *See also King v. Morton*, 520 F.2d 1140, 1153 (D.C. Cir. 1975) ("The Insular Cases, in the

manner in which the results were reached, the incongruity of the results, and the variety of inconsistent views expressed by the different members of the court, are, I believe, without parallel in our judicial history.").

"The doctrine of 'territorial incorporation' announced in the Insular Cases distinguishes between incorporated territories, which are intended for statehood from the time of acquisition and in which the entire Constitution applies *ex proprio vigore*, and unincorporated territories [such as American Samoa], which are not intended for statehood and in which only [certain] fundamental constitutional rights apply by their own force." *Commonwealth of N. Mariana Islands v. Atalig*, 723 F.2d 682, 688 (9th Cir. 1984).

Appellants and Amici contend the Insular Cases have no application because the Citizenship Clause textually defines its own scope. *See Examining Bd. of Engineers, Architects & Surveyors v. Flores de Otero*, 426 U.S. 572, 590 n.21 (1976) ("[T]he Court in *Dorr v. United States*, 195 U.S. 138, 143 (1904) . . . [held] that the Constitution, *except insofar as required by its own terms*, did not extend to the Philippines.") (emphasis added). We conclude the scope of the Citizenship Clause, as applied to territories, may not be readily discerned from the plain text or other indicia of the framers' intent, absent resort to the Insular Cases' analytical framework. *See Boumediene*, 553 U.S. at 726 (While the "Constitution has independent force in the territories that [is] not contingent upon acts of legislative grace[,] . . . because of the difficulties and disruptions inherent in transforming . . . [unincorporated territories] into an Anglo-American system, the Court adopted the doctrine of territorial incorporation, under which the Constitution applies . . . only in part in unincorporated territories").

13

Amici Curiae suggest territorial incorporation doctrine should not be expanded to the Citizenship Clause because the doctrine rests on anachronistic views of race and imperialism. But the Court has continued to invoke the Insular framework when dealing with questions of territorial and extraterritorial application. *See id.* at 756–64. Although some aspects of the Insular Cases' analysis may now be deemed politically incorrect, the framework remains both applicable and of pragmatic use in assessing the applicability of rights to unincorporated territories. *See id.* at 758–59 ("[T]he Court devised in the Insular Cases a doctrine that allowed it to use its power sparingly and where it would be most needed" in recognition of the "inherent practical difficulties of enforcing all constitutional provisions always and everywhere."). *See also Balzac v. Porto Rico*, 258 U.S. 298, 312 (1922) ("The Constitution . . . contains grants of power, and limitations which in the nature of things are not always and everywhere applicable and the real issue in the Insular Cases [is] . . . which [] of [the Constitution's] provisions [a]re applicable by way of limitation upon the exercise of executive and legislative power in dealing with new conditions and requirements" arising in the territorial context).

As the Supreme Court in *Boumediene* emphasized, the "common thread uniting the Insular Cases . . . [is that] questions of extraterritoriality turn on objective factors and practical concerns, not formalism." 553 U.S. at 764. While "fundamental limitations in favor of personal rights" remain guaranteed to persons born in the unincorporated territories, *id.* at 758 (quoting *Late Corp. of the Church of Jesus Christ of Latter-Day Saints v. United States*, 136 U.S. 1, 44 (1890)), the Insular framework recognizes the difficulties that frequently inure when "determin[ing] [whether a] particular provision of the Constitution is applicable," absent inquiry into the impractical or anomalous. *See id.*; *see also Downes*, 182 U.S.

at 292 (White, J., concurring) ("[T]he determination of what particular provision of the Constitution is applicable, generally speaking, in all cases, involves an inquiry into the situation of the territory and its relations to the United States.").

## A

American citizenship "is one of the most valuable rights in the world today." *Kennedy v. Mendoza-Martinez*, 372 U.S. 144, 160 (1963). "The freedoms and opportunities secured by United States citizenship long have been treasured by persons fortunate enough to be born with them, and are yearned for by countless less fortunate." *Fedorenko v. United States*, 449 U.S. 490, 522 (1981). Accordingly, even if the Insular framework is applicable, Appellants cite to a bevy of cases to argue citizenship is a fundamental right. *See, e.g.*, *Afroyim v. Rusk*, 387 U.S. 253 (1967); *Schneider v. Rusk*, 377 U.S. 163 (1964); *Kennedy v. Mendoza-Martinez*, 372 U.S. 144 (1963); *Trop v. Dulles*, 356 U.S. 103 (1958) (plurality op.). But those cases do not arise in the territorial context. Such decisions do not reflect the Court's considered judgment as to the existence of a fundamental right to citizenship for persons born in the United States' unincorporated territories. *Cf. Wong Kim Ark*, 169 U.S. at 679.[7]

---

[7] This Court, like the lower court, "is [also] mindful of the years of past practice in which territorial citizenship has been treated as a statutory, and not a constitutional right." *Tuaua*, 951 F. Supp. 2d at 98. "[N]o one acquires a vested or protected right in violation of the Constitution by long use . . . . Yet an unbroken practice . . . openly [conducted] . . . by affirmative state action . . . is not something to be lightly cast aside." *Walz v. Tax Comm'n of City of New York*, 397 U.S. 664, 678 (1970).

"Fundamental" has a distinct and narrow meaning in the context of territorial rights. It is not sufficient that a right be considered fundamentally important in a colloquial sense or even that a right be "necessary to [the] []American regime of ordered liberty." *Wabol v. Villacrusis*, 958 F.2d 1450, 1460 (9th Cir. 1990) (quoting *Duncan v. Louisiana*, 391 U.S. 145, 149 n.14 (1968)). Under the Insular framework the designation of fundamental extends only to the narrow category of rights and "principles which are the basis of *all* free government." *Dorr v. United States*, 195 U.S. 138, 147 (1904) (emphasis added); *Downes*, 182 U.S. at 283 ("Whatever may be finally decided by the American people as to the status of these islands and their inhabitants . . . they are entitled under the principles of the Constitution to be protected in life, liberty, and property . . . even [if they are] not possessed of the political rights of citizens of the United States.").

In this manner the Insular Cases distinguish as universally fundamental those rights so basic as to be integral to free and fair society. In contrast, we consider non-fundamental those artificial, procedural, or remedial rights that—justly revered though they may be—are nonetheless idiosyncratic to the American social compact or to the Anglo-American tradition of jurisprudence. *E.g.*, *Balzac*, 258 U.S. 298 (constitutional right to a jury trial does not extend to unincorporated territories as a fundamental right); *see also Downes*, 182 U.S. at 282 ("We suggest, without intending to decide, that there may be a distinction between certain natural rights enforced in the Constitution by prohibitions against interference with them, and what may be termed artificial or remedial rights which are peculiar to our own system of jurisprudence.").

We are unconvinced a right to be designated a citizen at birth under the *jus soli* tradition, rather than a non-citizen national, is a "*sine qua non* for 'free government'" or otherwise fundamental under the Insular Cases' constricted understanding of the term. *Corp. of Presiding Bishop of Church of Jesus Christ of Latter-Day Saints v. Hodel*, 830 F.2d 374, 386 n.72 (D.C. Cir. 1987). Regardless of its independently controlling force, we therefore adopt the conclusion of Justice Brown's dictum in his judgment for the Court in *Downes*. *See* 182 U.S. at 282–83. "Citizenship by birth within the sovereign's domain [may be] a cornerstone of [the Anglo-American] common law tradition," Brief for Petitioner-Appellant at 48, Tuaua v. United States, No. 13-5272 (D.C. Cir. April 25, 2014), but numerous free and democratic societies principally follow *jus sanguinis*—"right of the blood"—where birthright citizenship is based upon nationality of a child's parents.[8] *See Miller v. Albright*, 523 U.S. 420, 477 (1998) (citing various authority "noting the 'widespread extent of the rule of jus sanguinis.'"); Graziella Bertocchi & Chiara Strozzi, *The Evolution of Citizenship: Economic and Institutional Determinants*, 53 J.L. & Econ. 95, 99–100 (2010) (*jus sanguinis* has traditionally predominated in civil law countries, whereas *jus soli* has historically been the norm in common law countries).

In states following a *jus sanguinis* tradition birth in the sovereign's domain—whether in an outlying territory, colony, or the country proper—is simply irrelevant to the question of citizenship. Nor is the asserted right so natural and intrinsic to the human condition as could not warrant transgression in civil society. *See generally Dorr*, 195 U.S. at 147.

---

[8] "In the United States, nationality may be predicated either on jus soli . . . or on jus sanguinis . . . ." *Acheson v. Maenza*, 202 F.2d 453, 459 (D.C. Cir. 1953) (the latter is conferred statutorily).

"[C]itizenship has no meaning in the absence of difference." Peter J. Spiro, *The Impossibility of Citizenship*, 101 MICH. L. REV. 1492, 1509 (2003). The means by which free and fair societies may elect to ascribe the classification of citizen must accommodate variation where consistent with respect for other, inherent and inalienable, rights of persons. To find a natural right to *jus soli* birthright citizenship would give umbrage to the liberty of free people to govern the terms of association within the social compact underlying formation of a sovereign state. *Cf.* Aristotle, *Politics* bk. 3, *reprinted in part in* READINGS IN POLITICAL PHILOSOPHY 55, 87 (Francis W. Coker ed., 1938) ("The basis of a democratic state is liberty; which, according to the common opinion of men, can only be enjoyed in such a state[.]").[9]

**B**

The absence of a fundamental territorial right to *jus soli* birthright citizenship does not end our inquiry. "The decision in the present case does not depend on key words such as 'fundamental' or 'unincorporated territory[,]' . . . but can be reached only by applying the principles of the [Insular] [C]ases, as controlled by their respective contexts, to the situation as it exists in American Samoa today." *King*, 520 F.2d at 1147. *Cf. Boumediene*, 553 U.S. at 758 ("It may well be that over time the ties between the United States and any of its unincorporated Territories strengthen in ways that are of constitutional significance."). "[T]he question is which guarantees of the Constitution should apply in view of the particular circumstances, the practical necessities, and the

---

[9] The case before us pertains only to the permissibility of designating American Samoans as nationals, rather than citizens. We need not decide whether constitutional impropriety would arise if persons born in an unincorporated territory were also denied national status.

possible alternatives which Congress had before it." *Reid*, 354 U.S at 75. In sum, we must ask whether the circumstances are such that recognition of the right to birthright citizenship would prove "impracticable and anomalous," as applied to contemporary American Samoa. *Id.* at 74.

Despite American Samoa's lengthy relationship with the United States, the American Samoan people have not formed a collective consensus in favor of United States citizenship. In part this reluctance stems from unique kinship practices and social structures inherent to the traditional Samoan way of life, including those related to the Samoan system of communal land ownership. Traditionally *aiga* (extended families) "communally own virtually all Samoan land, [and] the *matais* [chiefs] have authority over which family members work what family land and where the nuclear families within the extended family will live." *King*, 520 F.2d at 1159. Extended families under the authority of *matais* remain a fundamentally important social unit in modern Samoan society.

Representatives of the American Samoan people have long expressed concern that the extension of United States citizenship to the territory could potentially undermine these aspects of the Samoan way of life. For example Congressman Faleomavaega and the American Samoan Government posit the extension of citizenship could result in greater scrutiny under the Equal Protection Clause of the Fourteenth Amendment, imperiling American Samoa's traditional, racially-based land alienation rules. Appellants contest the probable danger citizenship poses to American Samoa's customs and cultural mores.

The resolution of this dispute would likely require delving into the particulars of American Samoa's present legal and cultural structures to an extent ill-suited to the limited factual record before us. *See King*, 520 F.2d at 1147 ("The importance of the constitutional right at stake makes it essential that a decision in this case rest on a solid understanding of the present legal and cultural development of American Samoa. That understanding cannot be based on unsubstantiated opinion; it must be based on facts."). We need not rest on such issues or otherwise speculate on the relative merits of the American Samoan Government's Equal Protection concerns. The imposition of citizenship on the American Samoan territory is impractical and anomalous at a more fundamental level.

We hold it anomalous to impose citizenship over the objections of the American Samoan people themselves, as expressed through their democratically elected representatives.[10] *See* Brief for Intervenors, or in the Alternative, *Amici Curiae* the American Samoa Government and Congressman Eni F.H. Faleomavaega at 23–35, Tuaua v. United States, No. 13-5272 (D.C. Cir. Aug. 25, 2014) (opposing constitutional birthright citizenship). A republic of people "is not every group of men, associated in any manner, [it] is the coming together of . . . men who are united by common agreement . . . ." MARCUS TULLIUS CICERO, DE RE PUBLICA bk. I, ch. 25, 26–35 (George H. Sabine & Stanley B.

---

[10] We address only whether the Citizenship Clause mandates the imposition of birthright citizenship where doing so overrides the wishes of an unincorporated territory's people. We do not doubt Congress's general authority to, in its discretion, naturalize persons living in the United States's unincorporated territories nor do we question the expansive scope of birthright citizenship in the incorporated territories or opine on the general scope of Congress's powers under the Territorial Clause, U.S. CONST. art. IV, § 3, cl. 2.

Smith trans., Prentice Hall 1929). In this manner, we distinguish a republican association from the autocratic subjugation of free people. And from this, it is consequently understood that democratic "governments . . . deriv[e] their [] powers from the consent of the governed," *Kennett v. Chambers*, 55 U.S. (14 How.) 38, 41 (1852); under any just system of governance the fount of state power rests on the participation of citizens in civil society—that is, through the free and full association of individuals with, and as a part of, society and the state.[11]

"Citizenship is the effect of [a] compact[;] . . . [it] is a political tie." *Talbot v. Jansen*, 3 U.S. (3 Dall.) 133, 141 (1795) (distinguishing citizenship from the feudal doctrine of perpetual allegiance). "[E]very [] question of citizenship[] . . . [thus] depends on the terms and spirit of [the] social compact." *Id.* at 142. The benefits of American citizenship are not understood in isolation; reciprocal to the rights of citizenship are, and should be, the obligations carried by all citizens of the United States. *See Trop v. Dulles*, 356 U.S. 86, 92 (1958) ("The duties of citizenship are numerous, and the discharge of many of these obligations is essential to the security and well-being of the Nation."); THE FEDERALIST NO.

---

[11] *Cf.* THE FEDERALIST NO. 22 (Alexander Hamilton) ("It has not a little contributed to the infirmities of the existing federal system, that it never had a ratification by the People. . . Owing its ratification to the law of a State, it has been contended that the same authority might repeal the law by which it was ratified. . . . The possibility of a question of this nature proves the necessity of laying the foundations of our national government deeper than in the mere sanction of delegated authority. The fabric of American empire ought to rest on the solid basis of the consent of the People. The streams of national power ought to flow immediately from that pure, original fountain of all legitimate authority.") (emphasis omitted).

14 (James Madison) ("[T]he kindred blood which flows in the veins of American citizens, the mingled blood which they have shed in defense of their sacred rights, consecrate their Union.").

Citizenship is not the sum of its benefits. It is no less than the adoption or ascription of an identity, that of "citizen" to a particular sovereign state, and a ratification of those mores necessary and intrinsic to association as a full functioning component of that sovereignty. *See Minor v. Happersett*, 88 U.S. (21 Wall.) 162, 165–66 (1874) ("There cannot be a nation without a people. The very idea of a political community, such as a nation is, implies an association of persons for the promotion of their general welfare. Each one of the persons associated becomes a member of the nation formed by the association."). At base Appellants ask that we forcibly impose a compact of citizenship—with its concomitant rights, obligations, and implications for cultural identity[12]—on a distinct and unincorporated territory of people, in the absence of evidence that a majority of the territory's inhabitants endorse such a tie and where the territory's democratically elected representatives actively oppose such a compact.

We can envision little that is more anomalous, under modern standards, than the forcible imposition of citizenship

---

[12] *See also, e.g.*, Robert B. Porter, *The Demise of the Ongwehoweh and the Rise of the Native Americans: Redressing the Genocidal Act of Forcing American Citizenship Upon Indigenous Peoples*, 15 HARV. BLACKLETTER L.J. 107, 169 (1999) (arguing that statutorily "[f]orcing American citizenship upon Indigenous [Native American] people [destructively] transformed [their] political identity").

against the majoritarian will.[13] *See, e.g.*, U.N. Charter arts. 1, 73 (recognizing self-determination of people as a guiding principle and obliging members to "take due account of the political aspirations of the peoples" inhabiting non-self-governing territories under a member's responsibility);[14] Atlantic Charter, U.S.-U.K., Aug. 14, 1941 (endorsing "respect [for] the right of all peoples to choose the form of government under which they will live"); Woodrow Wilson, President, United States, Fourteen Points, Address to Joint Session of Congress (Jan. 8, 1918) ("[I]n determining all [] questions of sovereignty the interests of the populations concerned must have equal weight with the equitable claims of the government whose title is to be determined.") (Point V). *See also Tuaua*, 951 F. Supp. 2d at 91 ("American Samoans take pride in their unique political and cultural practices, and they celebrate its history free from conquest or involuntary annexation by foreign powers."). To hold the contrary would be to mandate an irregular intrusion into the autonomy of Samoan democratic decision-making; an exercise of paternalism—if not overt cultural imperialism— offensive to the shared democratic traditions of the United States and modern American Samoa. *See King v. Andrus*, 452 F. Supp. 11, 15 (D.D.C. 1977) ("The institutions of the present government of American Samoa reflect . . . the democratic tradition . . . .").

---

[13] Complex questions arise where territorial inhabitants democratically determine either to pursue citizenship or withdraw from union with a state. Such scenarios may implicate the reciprocal associational rights of the state's current citizens or the right to integrity of the sovereign itself.

[14] *But see Medellin v. Texas*, 552 U.S. 491 (2008).

23

## IV

For the foregoing reasons the district court is

*Affirmed.*